**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 3:23cr62** |
| | **)** | |
| **DAI'QUAN JARRVEL LANE,** | **)** | |
| **Defendant** | **)** | |

## MR. LANE'S MOTION TO DISMISS THE INDICTMENT

Dai'Quan Lane, through counsel, moves the Court to dismiss the indictment in this case as his prosecution under both counts of the indictment violates his Second Amendment right to keep and bear arms.

## INTRODUCTION

On June 23, 2022, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 142 S. Ct. 2111 (2022). That decision upended Second Amendment doctrine, replacing this Court's prior interest-balancing approach with an analysis grounded only in constitutional "text and history." *Id.* at 2129. Criminalizing ammunition possession pursuant to 18 U.S.C. § 922(g)(1) and machinegun possession under 18 U.S.C. § 922(o) is unconstitutional under *Bruen*'s "text and history" standard. 142 S. Ct. at 2138. *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

First, the Second Amendment's "plain text" entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests felons are not among

1

"the people."  Excluding felons from Second Amendment protection would violate the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that "the people" includes everyone who is "part of [the] national community"; that the right to bear arms "belongs to all Americans"; and that "the people" means the same thing in the Second Amendment as it does in the First, Fourth, and Ninth Amendments.

Second, under *Bruen*'s "text and history" standard, the government will be unable to rebut the presumption that § 922(g)(1) is unconstitutional.  The United States' "historical tradition of firearm regulation" shows that felon-disarmament laws did not appear until the 20th century—well after the period *Bruen* deems relevant.  And the government cannot discharge its burden by likening § 922(g)(1) to laws that disarmed supposedly "dangerous" or "unvirtuous" groups.  Those categories are far too broad under a proper *Bruen* analysis.

Third, 18 U.S.C. § 922(o), which bans machine gun possession, also violates the Second Amendment both facially and as applied after *Bruen* because it criminalizes possession of firearms "in common use" for the purpose of self-defense.  "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."  *Bruen*, 142 S. Ct. at 2132.  Section 922(o) is inconsistent with our country's historical tradition of firearms restrictions, and the government will be unable to point to "relevantly similar" restrictions to § 922(o) from the time the Second Amendment was promulgated.

As further explained below, this Court must dismiss the indictment against Mr. Lane.

## RELEVANT FACTS

On February 1, 2023, Mr. Lane, a rap music artist with a growing field of fans who is a lifelong American citizen born and raised in Richmond, Virginia, was playing one of his recordings live on Instagram. During the live performance, Mr. Lane sang along with the recording and displayed what appeared to be some sort of gun[1] while rapping. A Richmond Police Department Officer happened to be watching the live performance and knew that Mr. Lane had a prior felony conviction for perjury[2]. That officer and other officers came to where they thought Mr. Lane might be at Whitcomb Court and approached Mr. Lane in a consensual manner. Mr. Lane, as he had a right to do, turned and ran from the police. Police, after some searching, later recovered a gun loaded with ammunition from the general vicinity of where Mr. Lane ran. Mr. Lane made statements to the police regarding his past possession of that gun and his intended possession of the gun that evening.

The gun that the police recovered on February 1, 2023, was not the gun, or prop gun, depicted in Mr. Lane's live Instagram performance. Rather, the gun recovered was a privately made handgun with what the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") called a "Glock switch." The "switch" was a small plastic piece that appears to have been made using a 3-D printer. The "switch" purportedly operates by using a "leg" to push the trigger down so that multiple bullets shoot out with one trigger pull. According to an ATF examination of the "switch," the plastic "legs" on the "switch" are coming apart from the main plastic body of the "switch." The ATF reported, however, that even as damaged, the gun with the "switch" installed fired multiple rounds with one pull of the gun's trigger. Further, according to the ATF, this

---

[1] There is no evidence about whether this gun was in fact a real gun, or a "prop gun," which is a fake replica that rappers commonly use in music videos.

[2] Mr. Lane was convicted of perjury, which consisted of giving a false name, in 2021. *See* Exs. A and B. This is his only prior felony conviction.

"switch" converted the handgun to a "machinegun" as defined in federal gun laws.  *See, e.g.*, 26 U.S.C. § 5845(b).

Based on the facts above, on May 17, 2023, the government indicted Mr. Lane in this case on two counts.  Count One charges Mr. Lane with violating 18 U.S.C. § 922(g)(1) by possessing ammunition as a felon.  Count Two charged Mr. Lane with violating 18 U.S.C. § 922(o) by possessing a "machinegun."  Mr. Lane has pled not guilty and is awaiting trial in this matter.

Further facts are noted below as needed.

## ARGUMENT

I. ***Second Amendment law has evolved from* Heller*'s initial recognition of the right to bear arms to* Bruen*'s establishment of the "text and history" standard.***

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that based on the text of the Second Amendment and history, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation."  *Id.* at 576, 582, 592-95.  Further, possessing ammunition—whether already loaded into a gun or available for reloading—is inherent in the right to bear arms.  *See United States v. Miller*, 307 U.S. 174, 180-82 (1939) (describing and quoting militia laws in effect at time Second Amendment passed requiring possession of ammunition).

But in *Heller* the Supreme Court did not go any further than resolving the specific Second Amendment claim raised in that case.  The Court did not definitively establish a test for evaluating other Second Amendment claims, define the broader contours of the fundamental Second Amendment right, or delimit the outer bounds of that right.  *See United States v. Jimenz-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022) (Newsom, J., concurring) (recognizing that *Heller* left the

lower courts "in an analytical vacuum;" citing *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari) ("acknowledging that the Supreme Court 'has not definitively resolved the standard for evaluating Second Amendment claims'")).

It was only this past term in *Bruen* that the Supreme Court set forth an actual "test" for deciding the constitutionality of all firearm regulations. After first clarifying that the courts of appeals had misunderstood and misapplied *Heller* by embracing means-end scrutiny as having any role in Second Amendment analysis, *see Bruen*, 142 S. Ct. at 2126-29, *Bruen* clarified the "text and history" approach of *Heller* by newly bifurcating "text" and "history" into separate steps of an analysis to be used for deciding the constitutionality of all firearm regulations going forward. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. Mar. 9, 2023).

At Step One of *Bruen*'s Second Amendment test, courts are to consider only whether "the Second Amendment's plain text covers an individual's conduct." 142 S.Ct. at 2126. If it does, *Bruen* held, "the Constitution presumptively protects that conduct." *Id.* And, *Bruen* clarified, regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137.

*Bruen*, notably, not only clarified but extended *Heller*'s reasoning by newly articulating specific burdens and rules to govern the historical "tradition" inquiry. First, *Bruen* made clear that the burden of proof at Step Two rests entirely with the government. The government alone must "establish the relevant tradition of regulation." *Id.* at 2135, 2149 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." *Id.* at 2150. Rather, *Bruen* held, consistent with ordinary "principle[s] of party presentation," courts

must "decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. If that record yields "uncertainties," the Court dictated, courts should rely on *Bruen*'s "default rules"—the presumption of unconstitutionality at Step One and the government's burden at Step Two—"to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

Second, whereas in *Heller* and *Bruen*, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a 'distinctly similar' historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Stated differently, § 922(g)(1) is unconstitutional unless the government shows a tradition of "distinctly similar historical regulation" as of 1791 when the Second Amendment was ratified. *Id.* at 2126, 2131.

Third, the government's burden at Step Two of the new *Bruen* analysis does not stop at identifying a "distinctly similar historical regulation." Rather, the government must show that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* And a "tradition" of regulation requires more than one or two isolated examples. It requires a "widespread" historical practice "broadly prohibiting" the conduct in question. *Id.* at 2137-38. Although *Bruen* did not establish a clear threshold for determining when a historical practice rises to the level of a "tradition," it did hold that "a single law in a single State" is not enough, and even expressed doubt that regulations of three of the thirteen colonies "could suffice." *Id.* at 2142-45.

Finally, in weighing historical evidence, *Bruen* underscored that courts must take careful account of the relevant time frame. Indeed, *Bruen* held, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. As recognized in *Heller*, "Constitutional

rights are enshrined with the scope they were understood to have when the people adopted them,"
which in the case of the Second Amendment was in 1791. *Id.* As a general rule, the longer a
historical regulation pre- or post-dates this period, *Bruen* clarified, the less relevance it carries. *Id.*
at 2136-37. While historical practices "from the early days of the Republic" may be relevant in
interpreting an "ambiguous constitutional provision" if the practice was "open, widespread, and
unchallenged," *id.* at 2137, *Bruen* held, the relevance of such practices quickly fades and ultimately
vanishes as one approaches the mid- to late-19th century. *Id.* at 2137. At most, *Bruen* clarified,
practices from the mid-late 19th century can provide "secondary" evidence to bolster or provide
"confirmation" of a historical tradition that "had already been established." 142 S. Ct. at 2137.
But indisputably, by the time one gets to the 20th century, the relevance of historical evidence is
all but nonexistent, so much so that the Court in *Bruen* declined to "address any of the 20th century
historical evidence brought to bear by [the government] or their amici." *Id.*at 2154 n.28. In short,
to meet the *Bruen* Step Two inquiry, the historical tradition must be "longstanding," *id.* at 2139,
which means dating from 1791.

II.     ***Following* Bruen*, prosecuting Mr. Lane, whose only prior felony conviction is for
        perjury, for possessing ammunition as a felon violates the Second Amendment, both
        facially and as applied to Mr. Lane.***

        a.   *The Second Amendment's plain text protects the right of "the people," not only
             "law-abiding, responsible" people, to keep and bear arms.*

        The Second Amendment protects the right of "the people" to keep and bear arms.
Founding era dictionaries define "people" as "those who compose a community," and extending
to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A
nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas
Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies

every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.

Heller consistently interpreted "the people" as "unambiguously refer[ing] to all members of the national community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* began with a "textual analysis" of the Second Amendment's "operative" clause, initially observing the phrase "the right of the people" also appears in the First and Fourth Amendments. *Id.* at 578-79. Relying on its earlier construction of "the people" in the Fourth Amendment, the Court observed that "the people" is "a term of art." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). "'[Its uses] sugges[t] that 'the people,'" as used across the Bill of Rights as well as in the preamble, "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id.* at 579-81 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). The phrase "the people" thus created "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Indeed, *Bruen* cites *Heller* as directly stating, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'" *Bruen*, 142 S. Ct. at 2156 (citing *Heller*); *see also Range v. Att'y Gen.*, --- F. 4th ---, 2023 WL 3833404, at *4 (3d Cir. June 6, 2023) ("Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well.").

Although the Second Amendment's text does not circumscribe "the people" whose rights it guarantees, in other cases, the government has argued that "the people" are only "law-abiding, responsible" citizens such that (at least) those with prior convictions for offenses punishable by

8

more than one year (including state law misdemeanors punishable by more than two years' imprisonment) are categorically outside the scope of those entitled to Second Amendment protections. *See, e.g.*, *United States v. Range*, No. 21-2835, Doc. 48 at 1-2, 6 (3d Cir. Aug. 25, 2022) (en banc). But, to read "the people" protected by the Second Amendment as excluding "felons" would be contrary to text and at odds with the cardinal rule of statutory interpretation that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The untenable result would be to single out the Second Amendment for "specially unfavorable treatment." *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Then-Judge Barrett, reading *Heller* to interpret "'the people' as referring to 'all Americans,'" rejected the notion that felons are "categorially excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting). As Judge Bibas in the Third Circuit has observed, felons "are part of 'We the People of the United States.' U.S. Const. pmbl. So they too share in the Second Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits on that right." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 912-13, 923 (3d Cir. 2020) (Bibas, J., dissenting); *see also Range*, 2023 WL 3833404, at *4; *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) ("'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights"); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) (relying on founding-era dictionaries to construe "the people"); *United States v. Coombes*, ___ F. Supp. 3d ___, 2022 WL 4367056, *3-4 (N.D. Okla., Sept. 21, 2022).

In addition to being at odds with authority, text, and established canons of construction, defining "the people" by reference to a vague and malleable "law-abiding" standard suffers from

a lack of administrability that will bedevil courts for years to come and necessarily devolve into "interest-balancing." To the extent the "law-abiding" standard excludes those with felony convictions, this amounts to the very judicial deference to legislative interest-balancing *Bruen* rejected. 142 S. Ct. at 2129-31. Using the "law-abiding" test at *Bruen*'s first step ("plain text") "collapses the *Bruen* analysis and risks subjecting the Second Amendment to legislative fiat." *United States v. Reaves*, No. 4:22-cr-224 Doc. 55 at 16 (E.D. Mo. Jan. 9, 2023). Moreover, excluding "felons" from "the people" categorically precludes as-applied challenges, as it prevents any felon from ever surviving *Bruen*'s "plain text" test at step one. *Cf. Binderup v. Att'y Gen'l*, 836 F.3d 336 (3d Cir. 2016) (en banc) (finding 18 U.S.C. § 922(g)(1)'s permanent bar on firearm possession was unconstitutional as applied to petitioners with remote convictions for state misdemeanors punishable by more than two years that inter alia did not involve physical violence or threats of violence).

Further delimiting "law-abiding and responsible" beyond those with felony convictions— *e.g.*, ascertaining the type and transience of wrongdoing that excludes someone from "the people" will require the very "judge-empowering 'interest-balancing'" *Bruen* rejected. *Bruen*, 142 S. Ct. at 2129; *see also Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) ("[t]o say that certain people fall outside the Amendment's scope" means that "a person could be in one day and out the next"); *United States v. Perez-Gallan*, No. 22-cr-427, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (restricting "the people" to "law-abiding" could absurdly strip Second Amendment rights from the speeding driver and the shop-owner who forgets to post a "wet floor" sign). Judges lack "'the power to decide on a case-by-case basis whether the right is really worth insisting upon.'" *Id.* (quoting *Heller*, 554 U.S. at 634).

For instance, in *Range*, the en banc Third Circuit faced a challenge to 18 U.S.C. § 922(g)(1) from a man who had been previously convicted of making a false statement in connection with a public assistance application.  In addressing the government's argument in that case that the Second Amendment applied only to "law-abiding, responsible citizens", the Third Circuit observed:

> Who are "law-abiding" citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No. We are confident that the Supreme Court's references to "law-abiding, responsible citizens" do not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment. Perhaps, then, the category refers only to those who commit "real crimes" like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. William Blackstone, Commentaries on the Laws of England 54 (1769). But today, felonies include a wide swath of crimes, some of which seem minor. And some misdemeanors seem serious. As the Supreme Court noted recently: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, ⸺ U.S. ⸺, 141 S. Ct. 2011, 2020, 210 L.Ed.2d 486 (2021) (cleaned up). As for the modifier "responsible," it serves only to undermine the Government's argument because it renders the category hopelessly vague. In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a "responsible" citizen.

2023 WL 3833404, at *4.  The Third Circuit thus found that Mr. Range was among "the people" for purposes of Second Amendment protection despite his prior false statement conviction.

The Second Amendment text must be accorded its plain meaning—the same meaning it carries in other parts of the Bill of Rights—as "unambiguously" referring to all members of the national community.  Thus, because 18 U.S.C. § 922(g)(1) regulates conduct the Second Amendment protects, section 922(g)(1)'s prohibition on felons possessing guns is presumptively unconstitutional under *Bruen*'s plain text standard.

*b.* Bruen*'s historical test requires that the government show a robust tradition of "distinctly similar" historical precursors and teaches that exceptions to "the Second Amendment's 'unqualified command'" must be narrowly drawn.*

To rebut the presumption of unconstitutionality, the government must demonstrate that a challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Crucially, the nature of that burden varies depending on what kind of problem a statute is designed to address—specifically, whether the problem is old or new. In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 2131. The government must identify a robust tradition of "distinctly similar" founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* So, too, if some jurisdictions in the founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both *Heller* and *Bruen* fell in this category: the laws challenged in those cases were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.*

A "more nuanced approach" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" or addressing a problem that was "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. For the latter regulations, courts ask whether the modern regulation is "relevantly similar" to a historical analogue. The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [*i.e.*, the 'how'] and whether that burden is comparably justified [*i.e.*, the 'why']." *Id.* at 2132- 33.

12

At the threshold, then, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether it existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132. Felons' access to firearms, at which § 922(g)(1) is directed, has posed a (potential) problem since well before 1791. Although *Bruen* did not define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See Bruen*, 142 S. Ct. at 2123-24 & n.2. In a challenge to § 922(g)(1), therefore, a "distinctly similar" regulation would be one that either substantially abridged felons' right to keep and bear arms, or permanently denied firearms to some group very similar to felons (e.g., those convicted of some subset of especially serious crimes).

No such laws from the founding era exist exist. *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup*, 836 F.3d at 360 (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar*, 980 F.3d at 914-15 (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons"); *Kanter*, 919 F.3d at 458

(7th Cir. 2019) (Barrett, J., dissenting).  In fact, the first felon-in-possession laws similar to §
922(g)(1) did not appear until the 20th century.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the
Federal Firearms Act, prohibiting certain felons from "receiving" firearms.  *United States v.
Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251
(1938)).  At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm
"receipt" by those convicted of crimes such as murder, rape, and kidnapping.  *United States v.
Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also Range*, 2023 WL 3833404, at *5 (recognizing
that original federal ban on felons possessing guns applied only to those convicted of a "'limited
set of violent crimes such as murder, rape, kidnapping, and burglary'") (quoting *United States v.
Booker*, 644 F.3d 12, 24 (1st Cir. 2011)).  It was not until 1961 that Congress amended that statute
to prohibit "receipt" "by all felons."  *Skoien*, 614 F.3d at 640 (citing Pub. L. 87-342, 75 Stat. 757)
(noting that under the statute, "possession" was evidence of "receipt").  And it was not until 1968,
that Congress formally "changed the 'receipt' element of the 1938 law to 'possession,' giving 18
U.S.C. § 922(g)(1) its current form."  *Id.*  Thus, the first firearm regulation in America broadly
prohibiting all felons from possessing firearms was not enacted until almost two centuries after the
Nation's founding, when the modern version of § 922(g)(1) became law.  *See Kanter*, 919 F.3d at
464 n.12 (Barrett, J., dissenting) ("[T]he first general prohibition on felon gun possession was not
enacted until 1961 . . . ."); *id.* at 462 ("[S]cholars have not identified eighteenth or nineteenth
century laws depriving felons of the right to bear arms . . . .").

Section 922(g)(1) is the first law in our Nation's history to broadly prohibit all felons from
possessing a firearm.  There was nothing before the 20th century, even in individual colonies or
states.  *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371,

1376 (2009) ("state laws prohibiting felons from possessing firearms or denying firearm licenses to felons date from the early part of the twentieth century").  As *Bruen* makes clear, such "belated innovations . . . come too late to provide insight into the meaning of the Constitution in [1791]." 142 S. Ct. at 2137 (citing with approval the Chief Justice's dissent in *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008)); *see also id.* at 2154 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their amici").

In sum, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1).  The "Founders themselves could have adopted laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms. *Bruen*, 142 S. Ct. at 2131.  But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

Finally, and quite importantly, felons were not only permitted to possess firearms at the time of the Founding due to the absence of any laws specifically prohibiting them from doing so; felons were affirmatively required to possess firearms as members of the militia.  Notably, in *Heller*, the Supreme Court recognized that "the Second Amendment's prefatory clause"—*i.e.*, "A well regulated Militia, being necessary to the security of a free State"—"announce[d] the purpose for which the right was codified: to prevent elimination of the militia."  554 U.S. at 599. Given that preventing elimination of the militia was the purpose of the Second Amendment, it is reasonable that the Second Amendment's protections would at least have extended to those who would have been in the militia at the time of the founding.  And historical evidence from that period, which is the most relevant period as per *Bruen*, confirms that this group most definitely included felons.

15

*Heller* specifically defined the term "militia" in the Second Amendment's prefatory clause to mean "all males physically capable of acting in concert for the common defense." 554 U.S. at 595. Indeed, statutory law from the founding era demonstrates that "all males" required to serve in the militia encompassed felons. Specifically, in the first Militia Act enacted one year after the Second Amendment's ratification, Congress was clear that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271 (*see* Ex. D attached). The Act of 1792 further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition. *Id.* Although the Act "exempted" many classes of people from these requirements (e.g., "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons notably were not among those exempted. *Id.* § 2, § 1 Stat. 272.

In fact, at least eight state militia statutes, passed shortly before or after 1791, contained similar requirements. Specifically, these early state militia statutes similarly did not exempt felons:

- Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809);

- Wright and Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898);

- Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792);

- Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802);

- Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805);

- Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797);

16

- Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799); and

- Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808).

*See* Ex. C.

The fact that Founding era militia statutes did not exclude felons, and did require all militia members to possess firearms, confirms that the government cannot meet its heavy burden at *Bruen* Step Two of showing that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." At the most relevant time period under *Bruen*, namely, the time period immediately preceding and post-dating adoption of the Second Amendment, *see Bruen*, 142 S. Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them"), all white, able-bodied citizen/felons between the ages of 18-45 were required to serve in both the national and many state militias. And because of their militia obligation, these citizen/felons were required to possess firearms.

Thus, for all of the foregoing reasons, 18 U.S.C. § 922(g)(1) is facially unconstitutional.

    *c. Additionally, as applied to Mr. Lane, § 922(g)(1) is unconstitutional.*

Applying the foregoing analyses to the facts of this case, § 922(g)(1) is also unconstitutional as applied to Mr. Lane. Mr. Lane was born and raised in Richmond, Virginia and thus is a lifelong citizen of the United States. His only prior felony conviction is for perjuring himself by giving a false name. He is thus one of "the people" that the Second Amendment demands must be allowed to bear arms and carry necessary ammunition to make a gun operable. *See, e.g.*, *Range*, 2023 WL 3833404, at *6 (rejecting government's argument "'legislatures traditionally used status-based restrictions' to disarm certain groups of people", and that "[a]part from the fact that those restrictions based on race and religion now would be unconstitutional under

17

the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances"). The Second Amendment presumptively protects his conduct in possessing ammunition loaded into the gun found in this case. Because the government will be unable to show that § 922(g)(1) as applied to Mr. Lane is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, the Court must dismiss Count One.

III.    ***Following* Bruen*, prosecuting Mr. Lane for possessing a machine gun violates his fundamental right to keep and bear arms under the Second Amendment, both facially and as applied to Mr. Lane.***

Count Two charges Mr. Lane with violating 18 U.S.C. § 922(o). Section 922(o), which bans machine gun possession, also violates the Second Amendment both facially and as applied to Mr. Lane after *Bruen* because it criminalizes possession of firearms "in common use" for the purpose of self-defense. Further, the statute is inconsistent with the Nation's historical tradition of firearms restrictions.

*Heller* confirmed that the right the Second Amendment protects is an individual right that includes "us[ing] arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The word "arms" in the Second Amendment includes both "armour of defence" and "weapons of offence." *Heller*, 554 U.S. at 581. Since the founding, "arms" has included "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *see also Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms). While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including machineguns.

*Bruen*, 142 S. Ct. at 2132.   Thus, the plain language of the Second Amendment covers machineguns under the first step of the *Bruen* test (plain text), meaning that § 922(o) is presumptively unconstitutional.

Turning to the second step of the *Bruen* test, whether banning machinegun possession is consistent with our country's historical traditions in regulating guns, *Bruen* makes clear that the focus of the analysis on the type of "arms" at issue lies in whether they are commonly possessed for self-defense:

> we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." *Ibid.* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id.*, at 629, 128 S. Ct. 2783. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 142 S. Ct. at 2143.   Clearly such weapons cannot be used to terrorize people, but banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment.   *Id.* (recognizing that laws limiting self-defense laws in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people.").   The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms:

> The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

*Id.* at 2148-50.

19

Machine guns are unquestionably in common use today for the purposes of self-defense. As of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives[3]. As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States[4]. This is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense." *Caetano*, 577 U.S. at 420 (Alito, J., concurring); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use").

These figures also only includes lawfully owned firearms that were grandfathered in from before the passage of the statute in 1986. *See* 18 U.S.C. § 922(o)(2)(B); Pub. L. No. 99-308, sec. 102 (May 19, 1986). The actual number of machine guns currently owned by Americans is undoubtedly significantly higher. Even unlawfully owned machine guns count for the purposes of assessing whether it is in "common use." *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (explaining "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). Thus, as set forth above, section 922(o) is thus facially unconstitutional.

---

[3] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15–16 (2021), *available at* https://www.atf.gov/file/149886/download.

[4] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, 15–16 (2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

In this case, Mr. Lane possessed the purported machine gun in Whitcomb Court in Richmond, Virginia. Whitcomb Court is an area of town notorious for shootings, including shootings causing deaths. There is no evidence in this case that Mr. Lane had ever used the gun the police found. There is no evidence that Mr. Lane had ever breached the peace or harmed others using the gun. His simple possession of the gun was rather a clear exercise of his constitutional right under the Second Amendment to carry a commonly used weapon to have in case he needed to use it in his own self-defense in a dangerous neighborhood. Section 922(o) as applied to Mr. Lane in particular is unconstitutional.

## CONCLUSION

As set forth above, the Court should dismiss the indictment in this case as Mr. Lane's prosecution under both counts of the indictment violates his Second Amendment right to keep and bear arms.

Respectfully submitted,
DAI'QUAN JARRVEL LANE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org