IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:23-cr-062-RCY |
| DAI'QUAN JARRVEL LANE, | |
| Defendant. | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT (ECF 21)

### Introduction

Dai'Quan Jarrvel Lane is a convicted felon and has been since 2021. His felony status precludes him from possessing firearms and ammunition. But this is of no consequence to Lane, who has continued to possess firearms, and exceedingly dangerous ones at that. In February 2023, after flashing a firearm on social media, Richmond Police Department arrested Lane for the possession of a loaded Polymer 80 Glock-style semiautomatic handgun. Not only was Lane precluded from possessing the ammunition in the handgun because of his felon status, but he was precluded from possessing it regardless because it was affixed with a machinegun conversion device, which rendered it capable of firing fully automatic with a single trigger pull.

Lane now moves this Court to dismiss the indictment and hold that 18 U.S.C. § 922(g)(1) and § 922(o), which prohibit felons from possessing ammunition and firearms and prohibit anyone from possessing machineguns, respectively, are facially unconstitutional under *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Lane also asks this Court to find both statutes are unconstitutional as applied. Lane's motion should be denied.

First, binding Supreme Court and Fourth Circuit precedent compel the denial of Lane's

1

motion. Second, the Second Amendment excludes both felons and dangerous weapons, like machineguns, from the right it enshrines. Third, even if this Court did engage in a *Bruen* analysis, our nation's history and tradition supports prohibiting felons from possessing firearms and ammunition and anyone from possessing a machine gun. Over 100 district courts have reached the same conclusion regarding § 922(g)(1)[1] and nearly every Circuit to consider the issue has affirmed the constitutionality § 922(o). This Court should follow suit and deny Lane's challenges.

### Facts & Procedural History

In February 2023, Richmond Police Department's (RPD) Officer Railey was reviewing Instagram (IG) account "ighateskee23," an account known by RPD to be associated with Lane. On or about February 1, 2023, Officer Railey observed the user of the "ighateskee23" account go "Live." During the live stream, Lane, who had been convicted of felony perjury in 2021, brandished a firearm multiple times.

RPD officers went to Whitcomb looking for Lane approximately ten minutes after the Live video ended. At Whitcomb, officers saw Lane and recognized him to be wearing the same clothing as in the Live video. When RPD attempted to stop Lane, he took off running. Officers ultimately caught up to Lane and placed him under arrest.

RPD searched the area where Lane fled. On Lane's path of flight, on the side of a fence, officers found a privately made firearm ("PMF") with a suspected machinegun conversion device (a "switch") installed on the back of the firearm's slide, in lieu of a backplate. The switch

---

[1] A list of the over 100 district-court decisions that have rejected post-*Bruen* challenges to the constitutionality of § 922(g)(1)—including four district court rulings from this District—is included at Appendix A. To date, the United States is aware of only two decisions to the contrary (*Range* and *Bullock*, *infra*).

changes a normally semi-automatic pistol into a fully automatic pistol capable of firing multiple shots continuously without reloading with a single pull of the trigger. The PMF also had a 30-round extended magazine that was loaded with 20 rounds of ammunition.

The PMF recovered by RPD officers was the same style of firearm—a handgun with a gray grip, black side, and a switch affixed to the slide—as Lane had posted to his Instagram account a few days prior. But, the PMF recovered by RPD officers was notably different than the firearm Lane brandished in the  Live video from less than half an hour earlier.

In a post-*Miranda* interview, Lane admitted that he is a convicted felon. Lane initially denied knowledge of the PMF, but ultimately came clean, admitting he had found it months prior. Lane told officers he had lent the PMF to an individual who returned it with the machinegun conversion device installed. He also admitted he knew the machinegun conversion device made the PMF fire fully automatic, and that he had been on his way to sell the newly converted machinegun for approximately $750 before RPD arrested him.

ATF Firearms Technology Criminal Branch confirmed that the PMF is a "firearm" as defined in 18 U.S.C § 921(a)(3)(A); that the switch, in and of itself, is a "machinegun" as defined in 18 U.S.C § 921(a)(24); and that the PMF with the switch installed fired automatically with a single function of the trigger and is therefore a machinegun.

In May 2023, Lane was indicted on one count of possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a machinegun, in violation of 18 U.S.C. § 922(o). Lane asks this Court to take the herculean step of finding both § 922(g)(1) and § 922(o) unconstitutional, facially and as applied. Lane's request should be denied.

**Legal Standard**

The Supreme Court has described a facial challenge to a legislative Act as "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To succeed on a such a challenge, the movant must demonstrate that "no set of circumstances exists under which the Act would be valid," i.e., that the law is unconstitutional in all its applications. *Id.* Lane cannot make such a showing regarding § 922(g)(1)[2] for three reasons. First, *Bruen* did not undermine or modify *District of Colombia v. Heller*, 554 U.S. 570 (2008), which already upheld regulations that disarm felons. Second, the text and history of the Second Amendment show that the Second Amendment's scope is limited to law-abiding citizens who may possess firearms for lawful purposes. And third, categorical disarmament of all convicted felons, and the regulation of weapons not "typically possessed by law-abiding citizen for lawful purposes" is consistent with the historical tradition of firearms regulation in this nation. *Id.* at 625.

Nor can Lane's facial challenge to § 922(o) pass muster. Machineguns are excluded from Second Amendment protection, and Supreme Court interpretation supports this. And, even if machineguns were not excluded from the Second Amendment, prohibiting the possession of dangerous and unusual weapons, like machineguns, is supported by history and tradition.

Lane's as-applied challenges pack even less of a punch. Labeling a challenge as applied, versus facial, "affects the extent to which the invalidity of the challenged law must be

---

[2] Section 922(g)(1) prohibits the possession of *both* firearms and ammunition by prohibited persons. Lane, a felon, is charged with possessing the ammunition in the PMF machinegun. As a felon, though, Lane is equally prohibited under § 922(g)(1) from possessing either a firearm or ammunition.

demonstrated," *Bucklew v. Precythe,* 139 S. Ct. 1112, 1127 (2019), and "goes to the breadth of

the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310,

331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a

constitutional violation," and therefore the same substantive constitutional analysis applies.

*Bucklew*, 139 S. Ct. at 1127. Lane's argument here fails, too, for the same reasons.

### Section 922(g)(1)

**I.    Binding precedent requires the denial of Lane's motion.**

**A.  In *Heller*, the Supreme Court recognized the right of "law-abiding, responsible citizens" to bear arms.**

The Second Amendment provides that "[a] well regulated militia, being necessary to the

security of a free State, the right of the people to keep and bear arms, shall not be infringed." In

*Heller,* the Supreme Court interpreted this amendment through the lens of history and

determined that a D.C. law prohibiting handguns in the home was unconstitutional insofar as it

violated the rights enshrined in the Second Amendment. 554 U.S. at 616, 628-29. *Heller*, though,

did not create open season on federal firearm laws. Indeed, the Supreme Court recognized that

"[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626, and

that "[n]othing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons." *Id*. at 626-27. *See also McDonald v. City of Chicago*, 561 U.S.

742, 786 (2010) (in invalidating gun ordinances in Chicago, the Supreme Court provided "repeat

assurances" that prohibitions on felons possessing firearms were presumptively lawful).

**B.  *Bruen* confirmed *Heller's* ruling on § 922(g)(1)'s presumptive validity.**

*Bruen* neither overruled *Heller* nor invalidated *Heller*'s statement regarding § 922(g)(1)'s

presumptive validity. In *Bruen*, the Supreme Court struck down a New York law that required

5

residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home, finding that the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 142 S. Ct. at 2122, 2156.  In so ruling, *Bruen* diverged from Heller by rejecting the "two-step" framework adopted by most courts of appeals after *Heller*. The two-step approach "combine[d] history with means-end scrutiny" to assess the constitutionality of regulations impacting Second Amendment rights. *See id*. at 2125–26. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

In articulating this standard, *Bruen* did not overrule any of *Heller's* holdings. Quite the opposite. *Bruen* repeatedly relied on *Heller's* statements regarding the limits of the Second Amendment and the presumptive lawfulness of "longstanding prohibitions" on firearms possession. *Id*. at 2118, 2128, 2133, 2134. In fact, Justice Alito noted that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). And Justice Kavanaugh, joined by Chief Justice Roberts, emphasized that "the Second Amendment allows a 'variety' of gun regulations," and he reiterated *Heller's* assurances about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 2162 (Kavanaugh, J. and Roberts, C.J., concurring). These three concurring justices provided integral votes for the majority opinion.

For over a decade, the Supreme Court has endorsed the presumptive validity of laws

6

prohibiting convicted felons from possessing firearms. Neither *Heller*, *McDonald*, nor *Bruen* have cast doubt on any of Congress's long-standing categorial regulations as to who may possess firearms. Accordingly, this Court is still bound by *Heller's* holding that prohibitions on felons possessing firearms are presumptively valid and should deny Lane's motion to the contrary.

### C. Binding Fourth Circuit precedent requires the denial of Lane's challenge to § 922(g)(1).

In addition to *Heller*, this Court remains bound by Fourth Circuit precedent that has upheld the constitutionality of § 922(g)(1). *See United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) ("We now join our sister circuits in holding that application of the felon-in-possession prohibition to allegedly non-violent felons . . . does not violate the Second Amendment.); *United States v. Moore*, 666 F.3d 313, 316-17 (4th Cir. 2012) (noting "the unanimous result reached by every court of appeals that 922(g)(1) is constitutional, both on its face and as applied," and joining those courts by holding "922(g)(1) to be a constitutionally valid statute"); *see also Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) ("We simply hold that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the Second Amendment[.]" (internal quotations omitted)).

In *Moore*, 666 F.3d at 318, the Fourth Circuit held that a presumptively lawful regulation could not violate the Second Amendment unless it proscribed conduct "fall[ing] within the category of . . . '*law-abiding responsible* citizens . . . us[ing] arms in defense of hearth and home.'" *Id.* at 319 (quoting *Heller*, 554 U.S. at 635). Among the firearms regulations specifically enumerated as presumptively lawful in *Heller* are the "longstanding prohibitions on the possession of firearms by felons[.]" 554 U.S. at 626. In *Moore*, the defendant, a multi-time convicted felon, argued that the presumptively lawful felon-in-possession prohibition under § 922(g)(1) is facially unconstitutional because it infringes on the basic right of self-defense. 666

F.3d at 316. The Fourth Circuit had "no difficulty" rejecting the defendant's challenge: "[s]ince clearly there are cases where felon firearm possession is constitutionally limited, § 922(g)(1) survives a facial challenge." *Id.* at 319.

In *Pruess*, 703 F. 3d at 244, the Fourth Circuit considered a challenge to § 922(g)(1) lodged by a non-violent felon. Again, the Fourth Circuit concluded that the defendant in *Pruess* could not "rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him" and concluded that the defendant's conduct "fell outside the scope of the Second Amendment's protection." *Id*. at 246. The court observed, however, that the defendant erred "in suggesting that historical sources weigh in his favor." *Id.* On the contrary, there is "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *Id.* The court went on to note that "our sister circuits have consistently upheld applications of§922(g)(1)even to *non-violent*felons."*Id.*at 247.

Unless and until *Moore* and *Pruess* are overruled, either by the Supreme Court or the Fourth Circuit sitting *en banc*, they bind this Court. *See United States v. Collins*, 401 F.3d 212, 219 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding . . . unless it is overruled by a subsequent *en banc* opinion of this court or a superseding contrary decision of the Supreme Court." (internal quotations omitted)). Plainly, no decision has purported to expressly overrule *Moore* and *Pruess*. The question, then, is whether *Bruen* effectively overruled those precedents—in other words, whether *Bruen* "clearly undermined," *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998), or "specifically rejected," *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011), the reasoning on which they were based.

Clearly, *Bruen* did no such thing. Not only did the Supreme Court reaffirm *Heller* in *Bruen*, thereby effectively reaffirming *Moore* and *Pruess*, but eight members of the *Bruen* Court—six in

*Bruen* itself—have made clear that statutes like § 922(g)(1) are constitutional and supported by history. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations, "including 'longstanding prohibitions on the possession of firearms by felons[.]'" (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller's* holding [permitting felons to be prohibited from possessing firearms].").

That is not all. Two years earlier, Justice Thomas—who authored the majority opinion in *Bruen*—and Justice Gorsuch recognized that "history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). In short, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Moreover, nothing in *Bruen* undercuts *Moore* and *Pruess*. *Bruen*, as mentioned above, was concerned with the viability of the two-step "means-end scrutiny" test. 142 S. Ct. at 2125–27. It held that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context"; rather, the "firearms regulation [must be] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. But critically, the Fourth Circuit did not employ means-end scrutiny in *Moore* or *Pruess*; instead, it applied *Heller* to uphold the constitutionality of § 922(g)(1). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* were supported by

9

history. *See Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); and *Heller*, 554 U.S. at 626, 635 (acknowledging that permissible regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). Thus, by following *Heller*, the Fourth Circuit necessarily upheld § 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

By reaffirming *Heller*, and counseling courts to adhere more closely to it, *Bruen* effectively reaffirmed *Moore* and *Pruess*, which drew directly from *Heller*. *See United States v. Ingram*, No. CR 0:18-557, 2022 WL 3691350, at *2 (D.S.C. Aug. 25, 2022) ("The Court agrees with the government that *Bruen* clarified and 'reiterated[,]' rather than modified, the constitutional ruling in *Heller*, in the face of lower court rulings that failed to comport with its intended holding.") Accordingly, this Court is bound by *Moore* and *Pruess* to affirm the constitutionality of § 922(g)(1).

### D.    *Range* and *Bullock* do not require a different result.

Despite the above, Lane relies heavily on the Third Circuit's recent *en banc* decision in *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*), where the Third Circuit, *en banc*, granted an as-applied challenge to § 922(g)(1) with respect to a defendant convicted of making a false statement to obtain food stamps in violation of Pennsylvania law. ECF 21, Page.ID 49.

This Court should decline to follow *Range*. The Third Circuit is not binding authority on this Court. It is only binding to the extent that it is persuasive, and what this Court should find more persuasive is the fact that the Supreme Court has specifically and consistently cautioned that Second Amendment prohibitions on felons are "presumptively lawful." *See e.g. Bruen*, 142

10

U.S. at 2118, 2128, 2133, 2134.

The *Range* majority "downplay[ed] the Supreme Court's consistent admonishment that felon bans are 'longstanding' and 'presumptively lawful.'" *Range*, 69 F.4th at 114 (Schwartz, J., dissenting); *see also id.* at 119–20 (Krause, J., dissenting) ("[T]ime and again, the Supreme Court has acknowledged that the deep roots of felon-possession bans in American history impart a presumption of lawfulness to 18 U.S.C. § 922(g)(1) ... *Bruen* observed that historical analogies must be more flexible when a contemporary regulation implicates 'unprecedented social concerns or dramatic technological changes.' Section 922(g)(1) is such a regulation, as the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel were unknown at the Founding." (internal quotations and alterations omitted)); *id.* at 141 (Roth, J., dissenting) ("The Court did not, in *Bruen*, overrule its decisions upholding Congress's power to regulate the possession of firearms in interstate commerce. These decisions remain good law.")

At least one circuit has already considered the reasoning in *Range* and found it unpersuasive. In *United States v. Jackson,* 69 F.4th 495 (8th Cir. 2023), decided just days before *Range* issued, the Eighth Circuit upheld the application of § 922(g)(1), concluding that "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people," and that "[t]here appear to be two schools of thought on the basis for these regulations," namely, citizens who are not "law-abiding," regardless of their propensity for violence, and citizens who are more dangerous than the "typical" law-abiding citizen. *Id.* at 502. In holding that § 922(g)(1) is constitutional, the Court concluded "either reading" supported the constitutionality of § 922(g)(1) because the law itself is consistent with the Nation's historical tradition of firearm regulation." *Id.*, quoting *Bruen*, 142 S. Ct. at

11

2130. This is because, as explained more fully below, § 922(g)(1) as applied to Lane and other

convicted felons, "is consistent with the Nation's historical tradition of firearm regulation" and

"there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."

69 F. 4th at 502 (internal quotations omitted).

       Not only does the Third Circuit's decision in *Range* eschew the interpretation of the

Second Amendment by the Supreme Court, but it stands as an aberration in a sea of post-*Bruen*

decisions to the contrary. Over 120 district courts have ruled on 922(g) and found it

constitutional.[3] And, since the time of Lane's motion, the United States is aware of only one

other decision to the contrary. *See United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL

4232309 (S.D. Miss. 2023).

       *Bullock*, though, like *Range*, is not binding on this Court, and at least one district court

has already found it to be unconvincing. *See United States v. Shawn Marqus Robinson*, No. 3:21-

CR-00159-N, 2023 WL 4304762, at *2 (N.D. Tex. June 29, 2023) (after considering the ruling in

*Bullock*, the district court was "[p]ersuaded by the Government's sources, and affirmed in that

conclusion by the collective wisdom of other courts that have evaluated facial challenges in light

of the historical record . . . Section 922(g)(1) still passes constitutional muster." (internal

quotations omitted)).

       Accordingly, neither *Range* nor *Bullock* should not alter this Court's analysis. Under

Supreme Court and Fourth Circuit law, § 922(g)(1) is presumptively lawful. Nonetheless, if the

Court chooses to undertake a full *Bruen* analysis, Lane's argument fails a both steps because (1)

the Second Amendment does not cover the possession of firearms by felons and (2) restricting

---

[3] See Appendix A.

Second Amendment rights to "law-abiding" citizens is consistent with the Nation's historical traditions.

## II.    A *Bruen* analysis requires the denial of Lane's motion.

### A.    The Second Amendment does not cover Lane, a convicted felon.

Binding legal precedent requires this Court to deny Lane's motion. Even if it did not, Lane—a convicted felon—retains no Second Amendment rights. The Supreme Court and the Fourth Circuit have consistently defined the Second Amendment in a way that excludes convicted felons from the right it enshrines. Lane disagrees, arguing that he is one of "the people" whom the Second Amendment confers a right to "keep and bear arms" upon. Lane is wrong.

### 1.    The Supreme Court has interpreted the Second Amendment's text as protecting an individual right retained by law-abiding, responsible persons.

"[T]he people," as employed in the Second Amendment and throughout the Constitution, is a "term of art." *United States v. Collette*, No. 22-CR-00141, 2022 WL 4476790, at *5 (W.D. Tex. Sept. 25, 2022). In both *Heller* and *Bruen*, the Supreme Court defined "the people" as "law-abiding, responsible citizens," *See Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id*. at 2131 (quoting *Heller's* statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id*. at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id*. at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms").

Lane disregards the Supreme Court's reasoning, arguing that "felons were not only permitted to possess firearms at the time of the Founding due to the absence of any laws specifically prohibiting them from doing so; felons were affirmatively required to possess firearms as members of the militia." ECF 21, Page.ID 53. The Supreme Court considered this logic in *Heller* and found it lacking.

In *Heller*, the Court began its analysis of the Second Amendment by analyzing the Amendment's text to decide whether "the people" referenced in the Amendment was more likely a reference to individuals or the collective (the specific collective at issue there being the militia). 554 at 579–80. The Court began by explaining that "the people" is a term of art, which throughout other parts of the Constitution dealing with rights "unambiguously refers to all members of the political community, not an unspecified subset." *Id*.

The Court then further explained that it found "the militia" to be too narrow a subset to be an appropriate reading of "the people" because the "militia" only included people who were male, able bodied, and within a certain age range. *Heller*, 554 at 580–81 ("Reading the Second Amendment as protecting only the right to 'keep and bear Arms' in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.'"). In that narrow context of discussing whether "the people" referred to an individual or collective right, the court stated that "the people" presumably referred to an individual right that belonged to "all Americans." *Id*. at 581.

But in presuming that the Second Amendment right belonged to "all Americans," the Court did not hold that "all Americans" included felons. Rather—after completing a thorough historical analysis—the Court articulated that the exact interest protected by the Second Amendment's text was: "the right of *law-abiding*, *responsible* citizens to use arms in defense of

hearth and home." *Id*. at 635 (emphasis added); *see also id*. at 644 (Stevens J., joined by Souter, Ginsburg, and Breyer, J.J., dissenting) (explaining how the *Heller* majority "limits the protected class" in multiple ways). In fact, *Bruen* and its concurring opinions define the Second Amendment as applying to "law-abiding citizens" at least twenty-one times. *Bruen*, 142 S. Ct. at 2122, 2125, 2133, 2134, 2138, 2150, 2156, 2157, 2158, 2159, 2161.

Notably, the reason *Bruen* holds that "shall issue" licensing schemes are presumptively reasonable is the Court's determination that permissible licensing schemes will "often require applicants to undergo a background check . . . designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding and responsible citizens." *142* S. Ct. at 2138, n.9 (emphasis added); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[R]egimes [that] may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training . . . are constitutionally permissible."). This reasoning underscores that § 922(g)(1)—which also aims to ensure that "those bearing arms" are "law-abiding, responsible citizens"—accords with the Second Amendment.

### 2.   The Second Amendment's history confirms the Supreme Court's interpretation of its text.

The Second Amendment's history likewise reveals that the right it enshrined belonged only to law-abiding citizens. In *Heller*, after looking at the Amendment's plain words, the Supreme Court examined the Amendment's history. The Court explained that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Heller*, 554 U.S. at 592. In *Bruen*, the Supreme Court further elaborated that the Amendment codified a compromise between the interests of law-abiding, responsible citizens and the government. *See Bruen*, 142 S.Ct. at 2131 ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates

above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.").

Numerous courts of appeal agree that the Second Amendment codified "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible." *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011); *see also Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (holding that "a felony conviction removes one from the scope of the Second Amendment."); *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 349 (3d Cir. 2016) ("[P]ersons who have committed serious crimes forfeit the right to possess firearms much the way they 'forfeit other civil liberties, including fundamental constitutional rights.'"); *Moore*, 666 F.3d at 319 (holding that a defendant with prior felonies "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment['s] protection . . . "); *United States v. Yancey,* 621 F.3d 681, 684–85 (7th Cir. 2010) (explaining that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" (quoting *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010)); *United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (citation omitted).[4]

---

[4] For further scholarship on the "virtuous citizen" theory, *see Vongxay*, 594 F.3d at 1118. In short, the "virtuous citizen" theory is drawn from "classical republican political philosophy" and stresses that the "right to bear arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *Rene E.*, 583 F.3d at 15 (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

In line with these circuits' holdings, Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, that "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and that "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868).  It is still true today that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160; *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

To the extent that Lane may rely on *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), to argue the contrary—that all citizens are part of the political community protected by the Second Amendment—his reliance would be misplaced. *Rahimi* involved a challenge to a different firearm law altogether that did not involve a prior felony conviction. The law at issue there, § 922(g)(8), involves firearm restrictions against those subject to domestic violence protection orders. And nothing in *Rahimi* indicated that Rahimi had a prior criminal record, let alone a prior felony. In any event, even *Rahimi* affirmed that "*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights," including convicted felons, and "*Bruen*'s reference to 'ordinary, law-abiding' citizens is no different."  61 F.4th at 452.[5]

---

[5] *Rahimi* "left unresolved whether *Heller* and *Bruen* should be interpreted to mean that individuals convicted of felonies are excluded from the Second Amendment's coverage altogether, or that their disarmament is constitutionally permissible so long as the Government

**B.      Congress's authority to categorically disarm all convicted felons is consistent with the tradition of firearms regulation in this nation.**

*Bruen*'s two-part test for assessing Second Amendment challenges only burdens the government with justifying its regulations after it is established that challenged conduct falls within the Second Amendment's scope. *See Bruen*, 142 S. Ct. at 2129–30. Accordingly, where—as here—the person falls outside the scope of the Second Amendment, the government does not bear the burden of presenting a historical tradition to support its regulation.

But assuming Lane is one of "the people" to whom a Second Amendment right is guaranteed, his motion must still be denied because historical analysis shows our nation's tradition of disarming "unvirtuous, irresponsible, and/or dangerous citizens." *See Binderup*, 836 F.3d at 349 ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

**1.      *Bruen*'s second step does not require the government to identify a historical twin.**

In noting that the government bears the burden as to *Bruen*'s second step, the Supreme Court did not require that the government identify a "historical twin" to the modern-day prohibition. 142 S. Ct. at 2133. The Supreme Court recognized that "historical analysis" of laws and regulations that existed in the late-eighteenth century "can be difficult," because "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id.* at 2131, 2132. Therefore, modern courts may (and often must)

---

demonstrates historical support for the specific regulation." *See United States v. Shawn Marqus Robinson*, No. 3:21-CR-00159-N, 2023 WL 4304762, at *2 (N.D. Tex. June 29, 2023). Even if the latter were the case, a review of "this Nation's historical tradition of firearm regulation," as set forth later in this response, would compel upholding felons' categorical disarmament. *See Bruen*, 142 S.Ct. at 2126.

conduct "reasoning by analogy," which requires identification of a "well-established and representative historical analogue, not a historical twin." *Id.* at 2133. Finally, even where the "historical record yields relatively few" direct examples, those few examples may pass constitutional muster where there is little record of any "disputes regarding the lawfulness of such prohibitions." *Id.*

It does not matter, then, that the federal felon-in-possession law is of mid-20th century vintage. *See* ECF No. 21, Page.ID 52; *Nat'l Rifle Ass'n of Am., Inc. v. Bur. Of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the founding but that they were analogous enough to historical regulations to be deemed "longstanding." 544 U.S. at 626.

## 2. Felon-in-possession laws comport with historical tradition, and have historically included both violent and non-violent individuals.

While engaging in historical analysis, the Supreme Court has observed particular relevance in "English history dating from the late 1600s," "American colonial views leading up to the founding," "and any post-ratification practices that persisted into the 19th century." *See Bruen*, 142 S.Ct. at 2127, 2136; and *Heller*, 554 U.S. at 592–95. Indeed, restrictions of the possession of firearms date to both of those periods. In England in the late 1600s, the government disarmed non-Anglican Protestants who refused to participate in the Church of England. Joyce Lee Malcom, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994). The government also disarmed those who were "dangerous to the Peace of the Kingdom." *Militia Act of 1662*, 13 & 14 Car. 2 c. 3, § 13. The English Bill of Rights established Parliament's authority to determine which citizens could "have arms ... by Law." *An Act*

*Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown*, 1 W. & M., Sess. 2, c. 2, § 7 (1689)); *see Bruen*, 142 S. Ct. at 2141-42.

Colonial America likewise prohibited a wide swath of individuals from possessing firearms—not just those who were violent or dangerous. For example, Native Americans, religious minorities, and those who refused to declare an oath of loyalty during the revolution were all disarmed. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 578-79 (1998);

Around the time that the Second Amendment was ratified (1791), several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate—both of which necessarily terminated the felon's capacity to keep and bear arms following conviction. *See Medina*, 913 F.3d at 158 ("Capital punishment for felonies was '"ubiquit[ous]' in the late Eighteenth Century and was 'the standard penalty for all serious crimes.' (quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring)). The "comparatively lenient" punishment of disarmament was thus easily within the scope of these draconian punishments. *Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

Also during the ratification era, proposals made during states' constitutional ratification conventions reflected a common understanding of government authority to disarm those who would not abide by the law. The Pennsylvania convention by the Dissent of the Minority, which was composed of the state's Anti-Federalist delegates, concluded that:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.

20

2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added)). Notably, the Supreme Court itself characterized the Pennsylvania Minority's proposal as "highly influential" in the constitutional ratification debates. *Heller*, 554 U.S. at 604.

Congruent with the above, and germane here, is that multiple American legislatures passed laws during the time of the Revolutionary War that disarmed non-violent individuals who could not, or would not, adhere to social and legal norms. For example, in 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

At common law many felonies were punishable by death, rendering the issue of post-felony gun relinquishment moot. And these harsh sentences were not restricted to "crimes of violence" or "dangerous crimes." The First Congress treated "forgery, [dealing in] forged securities, [and] counterfeiting" as capital crimes. *Folajtar v. Att'y Gen. U.S.*, 980 F.3d 897, 905 (3d Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012)). Several states similarly subjected forgers to the death penalty. *See* Thomas Herty, *A Digest of the Laws of Maryland* 255-56 (1799) (forgery punishable by "death as a felon, without benefit of clergy"); 2 Laws of the State of New York 74 (1791) (an individual convicted of forgery "shall be hanged

by the neck until he . . . shall be dead"); see also 1 *The Laws of the Commonwealth of Massachusetts* 250, § 5 (1807) (forgery of bank bills may be punishable by death). Even in cases where they were not put to death, at common law felons were "'civilly dead,' having lost all rights including the right to possess property of any kind." Don B. Kates, *A Modern Historiography of the Second Amendment*, 56 UCA L. Rev. 1211, 1231 n. 100 (2009). Given the treatment of felons at the time, it is difficult to imagine the Founders considering them an indispensable part of the "political community." *Heller*, 554 U.S. at 580. Unsurprisingly, at the time of the founding, any state "which accepted the right to arms invariably extended that right only to virtuous citizens . . .." Kates, 56 UCLA L. Rev. at 1231 n. 100.

With the above in mind, it is clear that this nation has a historical tradition of using status-based restrictions to disarm certain categories of people, explicitly or implicitly. Even more important is that restrictions did not fixate on a propensity for violence alone, but also on an individual's ability (or inability) to comply with an orderly society's norms. Perjury certainly falls within those contours and has been treated with appropriate seriousness for centuries. Felony perjury, especially in a criminal case, indicates a propensity for lawlessness that it is clear early colonial laws sought to avoid. Perjury is a flagrant affront to the administration of justice, and truthfulness before an impartial tribunal is a long-recognized social necessity. *See e.g.* 10 Ariz. J. Int'l & Comp. L. 215, 245-47 (perjury in early America was a felony and at least three statutes, from 1790 through 1909, called for three to five years of imprisonment).

The bottom line is that history and tradition supports the disarmament of felons, including non-violent ones, and so Lane's facial challenge to § 922(g)(1) fails. Likewise, history reflects that our legislatures have traditionally possessed discretion in disarming individuals "who deviated from legal norms *or* persons who presented an unacceptable risk of dangerousness."

*Jackson*, 69 F.4th at 505 (emphasis added). Lane has demonstrated his inability to be trusted to follow legal and social norms by lying to a Virginia court, and so it follows that his disarmament under § 922(g)(1), as applied, is consistent with this nation's history and tradition of firearm regulation.

**Section 922(o)**

**I.      Possession of machineguns is not protected under the Second Amendment.**

Section 922(o), which was enacted in 1986, bans the transfer or possession of a machinegun, with limited exceptions for (1) the transfer to, or possession by, a person acting under authority of the United States, or (2) any lawful transfer or possession of a machinegun that was lawfully possessed before the statute's enactment.

Lane argues that § 922(o) is facially unconstitutional because the Second Amendment protects weapons "in common use" for the purpose of self-defense and because it is inconsistent with the nation's historical tradition of firearms restrictions. ECF 21, Page.ID 56. But the Second Amendment right— "like most rights"—is not unlimited; it does not allow every person "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. And the Supreme Court has clearly delimited the Second Amendment to exclude exceedingly dangerous weapons like machineguns.

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld a Second Amendment challenge to two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236. Almost a century later, the Supreme Court in *Heller* affirmed *Miller*, explaining "the Court's basis for saying that the Second Amendment did not apply was … that the type of weapon at issue was not eligible for Second Amendment protection." 554 U.S. at 622 (emphasis removed).

*Heller* concluded, "[w]e therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right." *Id*. at 625.

In describing limits on the scope of the Second Amendment right at the conclusion of the *Heller* opinion, the Supreme Court returned to *Miller* and explained one "important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 637 (citing *Miller*, 307 U.S. at 179).

*Bruen* did nothing to disturb the throughline in *Miller* and *Heller*. *Bruen* reaffirmed *Heller's* finding there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148–149: Miller, 307 U.S. at 179). Likewise, Justice Kavanaugh's concurring opinion, joined by the Chief Justice, reiterated an "important limitation on the right to keep and carry arms." *Bruen*, 142 S. Ct. at 2162. "*Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. (citing *Heller*, 554 U.S. at 626−627, and n. 26; *McDonald*, 561 U.S. at 786 (plurality opinion)).

Multiple courts have correctly relied on *Heller* to conclude that machineguns fall outside the Second Amendment's scope. *See, e.g., United States v. One (1) Palmetto State Armory PA15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3d Cir. 2016); *Hamblen v. United States*,

591 F.3d 471, 473-74 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008); and *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012); *see also Hollis v. Lynch*, 827 F.3d 436, 448-41 (5th Cir. 2016) ("Machine guns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection ...").

Notably, the *en banc* Fourth Circuit has relied on similar reasoning to hold that a Maryland law regulating semi-automatic assault rifles like an AR-15 and large-capacity magazines fall outside the Second Amendment. See *Kolbe v. Hogan*, 849 F.3d 114, 135–37 (4th Cir. 2017). The Fourth Circuit explained, "Are the banned assault weapons and large-capacity magazines "like" "M-16 rifles," i.e., "weapons that are most useful in military service," and thus outside the ambit of the Second Amendment? The answer to that dispositive and relatively easy inquiry is plainly in the affirmative." *Kolbe*, 849 F.3d at 136 (citing *Heller*, 554 U.S. at 627).[6]

Binding Supreme Court precedent makes clear that the Second Amendment affords protection only to those weapons "in common use" by private citizens at the time of its enactment. "[s]ince *Heller* was decided, every circuit court to address the issue has held that there is no Second Amendment right to possess a machine gun." *United States v. Hoover*, No. 321CR22S3MMHMCR, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022)(internal quotations omitted) (citing *United States v. Allen*, 630 F.3d 762, 766 (8th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 94–95 (3d Cir. 2010); Hamblen, 591 F.3d at 472, 474; *Fincher*, 538 F.3d at 874; see also *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (relying on *Heller* to find that "the Second Amendment does not protect [the defendant's

---

[6] Although *Bruen* abrogated the *en banc* Fourth Circuit's alternative holding that relied on intermediate scrutiny, *Bruen* did not abrogate *Kolbe's* ruling about what counts as "dangerous and unusual weapons" that fall outside the Second Amendment. *Bruen*, 142 S. Ct. at 2126.

personal possession of machine guns.").

     In light of this framework, this Court should deny Lane's motion.

## II.    Prohibiting the Possession of Machineguns Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

     Because the Second Amendment does not protect the possession of machineguns, this Court should deny Lane's motion. But even if the Court were to conclude otherwise, § 922(o) should still be upheld because it "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.

     *Heller* explained that this nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 637; see also *Bruen*, 142 S. Ct. at 2128. Indeed, English common law recognized "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148-49 (1769). The same premise was historically recognized in the United States, with courts holding that a person commits "an offence at common law" when they "arm[] [themselves] with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). It is hard to imagine a weapon that more plainly "cause[s] a terror to the people" than a fully automatic firearm.

     *Bruen* reaffirmed *Heller's* finding that there is a "fairly supported" "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 142 S. Ct. at 2128 (internal citations omitted). But Lane ignores both *Bruen* and *Heller's* admonishments on this point and urges this Court to conclude that machineguns are in "common use" simply because there are approximately 740,000 in circulation. ECF 21, Page.ID 58.

     First, that number, by Lane's admission, accounts for machineguns legally possessed before the enactment of § 922(o) in 1986. ECF 21, Page.ID 58. Second, even if that singular fact

piqued the Court's interest, it is easily disposed of because "this number is far below the 50 million large-capacity magazines the Second Circuit held was sufficient for a showing of common use in *N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015)" and "also below the more than 8 million AR- and AK- platform semi-automatic rifles manufactured in or imported into the United States" that the Fourth Circuit held, in *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), was sufficient for a showing of common use." See *Hollis*, 827 F.3d at 449.

The Supreme Court, in both *Heller* and *Bruen*, has already concluded our nation's history and tradition supports regulating dangerous and unusual firearms. So, assuming this Court does not conclude that the plain text of the Second Amendment excludes machineguns, it should reject Lane's motion on historical grounds.

## II.     There is no category of people that can possess a machinegun, and so §922(o) cannot be unconstitutional as applied to Lane.

Lane's facial challenge to § 922(o) fails. So too must his as-applied challenge. Lane insists that a machinegun is a normal and common weapon to carry (it's not) and that he carried it for his own protection (he didn't). Lane told officers that same evening that he had been on his way to sell the machinegun when he was stopped by RPD. Sheer common sense, then, demands a rejection of Lane's argument.

In any event, Lane's claimed purpose for carrying the machine gun is a house of cards. As argued above, machineguns are not protected by the Second Amendment. They cannot be possessed for protection. They cannot be possessed at all.  Lane fails to raise a cognizable as-applied challenge to § 922(o)—which is constitutional—and so the Court should deny his motion.

**Conclusion**

The Supreme Court has never cast doubt on the validity of § 922(g)(1) or § 922(o). This is because the conduct they proscribe is excluded from the Second Amendment. Even so, a historical analysis shows that this nation's history and traditions support their constitutionality. Accordingly, and for the foregoing reasons, the United States respectfully requests that this Court DENY Defendant's Motion to Dismiss the Indictment (ECF 21).

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Devon E. Schulz
Michigan Bar No. P80959
Special Assistant United States Attorney
Eastern District of Virginia
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: devon.schulz@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of July, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By:         /s/
           Devon E. Schulz
           Michigan Bar No. P80959
           Special Assistant United States Attorney
           Eastern District of Virginia
           919 East Main Street, Suite 1900
           Richmond, VA 23219
           Phone: (804) 819-5400
           Fax: (804) 771-2316
           Email: devon.schulz@usdoj.gov