**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 3:23cr62** |
| ) | |
| **DAI'QUAN JARRVEL LANE,** ) | |
| **Defendant** ) | |

<u>**MR. LANE'S REPLY TO THE GOVERNMENT'S RESPONSE**</u>
<u>**TO HIS MOTION TO DISMISS THE INDICTMENT**</u>

Dai'Quan Lane, through counsel, replies as follows to the government's response, *see* ECF No. 28, to his motion to dismiss the indictment in this case, *see* ECF No. 21:

**I.** **_Neither_ Heller _nor pre-_Bruen _Fourth Circuit case law foreclose Mr. Lane's claims in this case._**

The government has argued that 18 U.S.C. § 922(g)(1) remains constitutional post-*Bruen* because of (1) dictum about felon-disarmament laws in *Heller* and (2) the Fourth Circuit's post-*Heller*/pre-*Bruen* treatment of § 922(g)(1)[1]. Neither establishes § 922(g)(1)'s constitutionality.

*a. The* Heller *dictum*

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Supreme Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). It went on:

---

[1] For a well-supported and persuasive analysis of the government's collection of cases denying challenges to § 922(g)(1), *see United States v. Bullock*, 2023 WL 4232309, at *14-25 (S.D. Miss. June 28, 2023) (methodically analyzing and dismissing analyses in cases on seemingly identical list government submitted in that case).

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Here, the government argues that *Heller* thus conclusively holds that felon-disarmament laws are consistent with the Second Amendment. That view is mistaken. The question of felon-disarmament laws' constitutionality was not before the *Heller* Court, and any statements in the opinion addressing that question are thus "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *accord Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same).

Of course, lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Supreme Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. The Fourth Circuit has thus declined to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282, 283 (4th Cir. 2008) (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta).

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court dicta unentitled to "talismanic effect." *Id.* at 283. That dictum was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion," or even abbreviated discussion, of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019). Indeed, the *Heller* Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

*Heller* itself indicates its dicta should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "ipse dixit," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right if that deprivation is consistent with history and tradition." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020). The *Heller* Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws would make no sense if the Court believed felons could be disarmed regardless of whether history supported that exclusion. As Judge Reeves put it in his recent decision in *United States v. Bullock*, "[*Heller*] reassured us that 'there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when

those exceptions come before us.' After *Bruen*, that time has arrived."  2023 WL 4232309, at *19 (S.D. Miss. June 28, 2023) (quoting 554 U.S. at 635).

Regardless, even if the *Heller* dictum might once have warranted deference, it no longer does.  Just before its reference to "longstanding prohibitions" on felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  554 U.S. at 626.  Fourteen years later, the *Bruen* Court confronted a challenge to a New York law severely restricting the concealed carry of firearms in public—another of the "presumptively lawful" measures identified in *Heller*.  *See United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons.").

If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s approval of such laws and upheld New York's statute on that basis.  But that is not what the *Bruen* Court did.  The *Bruen* Court instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America.  *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, 142 S. Ct. 2111, 2135-56 (2022).  And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 2156, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are unconstitutional where the state forbids open carry. *See id.* at 2144-47, 2150.

Further, the government's argument to the contrary is critically flawed.  The government argues that "*Bruen* repeatedly relied on *Heller*'s statements regarding the limits of the Second Amendment and the presumptive lawfulness of 'longstanding prohibitions' on firearms

possession."  ECF No. 28 at 6 (citing *Bruen*, 142 S. Ct. at 2118[2], 2128[3], 2133, 2134[4]).  The government is patently misguided in that assertion.  The only time that the *Bruen* majority[5] discussed a presumption of lawfulness is when discussing that when the plain text of the Second Amendment covers the purportedly prohibited conduct, the "Constitution presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2130.  Then, rather than finding that ***any*** gun regulation is presumptively lawful, the *Bruen* Court directed lower courts to sustain challenges to ***all*** gun laws that the government does not show are "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130; *United States v. Charles*, No. MO:22-CR-154-DC, 2022 WL 4913900, at *2 (W.D. Tex. Oct. 3, 2022) ("this is where *Bruen* conflicts with *Heller*. . . . because possession is covered by the Second Amendment's plain text, *Bruen* makes a felon's possession of a firearm 'presumptively constitutional.'   *Bruen* is the controlling standard, but this conflict—the presumption of constitutionality—is what places the heavy burden on the Government.").

The lesson for § 922(g)(1) is clear.  Rather than treating *Heller*'s "longstanding prohibitions" passage as dispositive, this Court must task the government with actually investigating the historical record to determine whether felon-disarmament laws are in fact consistent with the Second Amendment.  Indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to concealed-carry bans in *Bruen*.

---

[2] This particular citation is to the syllabus in *Bruen*, which is not part of the opinion itself.
[3] This citation refers to the *Bruen* Court's summary of *Heller*.
[4] These latter two citations simply do not support the government's argument.
[5] The government further argues that the *Bruen* majority's holding is limited by separate concurrences by some of the justices.  *See* ECF No. 28 at 6.  Again, the government's argument is incorrect.  Justice Thomas wrote the Court's majority opinion in *Bruen*.  Justices Alito, Gorsuch, Kavanaugh, and Barrett joined that opinion in full, creating a majority opinion of five justices that does not rely on the existence of any of the separate concurrences.  *See* Ex. A; *compare Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

*Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises.  554 U.S. at 626.  For felon-disarmament laws, by contrast, it cited no sources at all.  *Id.* at 626-27.  If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it necessarily follows that *Heller*'s cursory approval of felon-disarmament laws does not end the inquiry.

The Seventh Circuit made this point in a recent Second Amendment challenge to § 922(g)(1), where the government asked the court to "sidestep *Bruen*" by simply invoking *Heller*'s "oft-quoted dicta."  *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).  The court declined, concluding it must "roll[] up its sleeves" and "undertake the text-and-history inquiry the [*Bruen*] Court so plainly announced and expounded upon at great length."  *Id.*  This Court must do the same.  *See also Range v. Att'y Gen.*, 69 F.4th 96, 101-02 (3d Cir. 2023) (rejecting government's request to uphold § 922(g)(1) based on *Heller*'s dictum); *Bullock*, 2023 WL 4232309, at *18 (dismissing "presumptively lawful" dicum as "'judicial lawmaking'" and declining to follow it because "[f]ederal courts are only permitted to rule upon an actual 'case or controversy,' and lack jurisdiction to render merely advisory opinions beyond the rulings necessary to resolve a dispute," as the government purports that *Heller* did).

> b.  *The Fourth Circuit's pre-*Bruen *cases upholding § 922(g)(1) do not survive* Bruen*.*

Nor do the Fourth Circuit's post-*Heller* § 922(g)(1) cases survive *Bruen*.  Following *Heller*, the Fourth Circuit in *United States v. Chester* laid out a two-step, means-ends inquiry for Second Amendment claims.  628 F.3d 673, 680-83 (4th Cir. 2010).  That case involved a challenge to 18 U.S.C. § 922(g)(9), which criminalizes possessing a gun after conviction for a "misdemeanor crime of domestic violence."  *Id.* at 677.  Later, in *United States v. Moore*, 666 F.3d 313, 315 (4th

6

Cir. 2012), the Fourth Circuit addressed a Second Amendment challenge to a statute—§ 922(g)(1)—that is among the "presumptively lawful regulatory measures" identified in *Heller*.

*Moore* noted that *Heller* said "'nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" which *Heller* characterized as "'presumptively lawful regulatory measures.'"  *Id.* at 317-18.  The *Moore* court expressed confusion about this aspect of *Heller*, observing that whether felon disarmament laws "could be lawful because they regulate conduct outside the scope of the second amendment" or "because the pass muster under any standard of scrutiny," the presumptive lawfulness of § 922(g)(1) precluded a facial challenge to that statute.  *Id.* at 318.  But the *Moore* court felt no need to resolve that question.  Because "the presumption of constitutionality . . . govern[ed]," the court did "not pursue an analysis of the historical scope of the Second Amendment right," as it otherwise would have at *Chester*'s step one.  *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) (discussing *Moore*).  Instead, it simply concluded "the *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review."  *Moore*, 666 F.3d at 318.  Specifically, *Moore* held *Heller*'s reference to "presumptively lawful" felon-disarmament laws "negates a facial challenge to a felon in possession statute like § 922(g)(1)."  *Id.*

This conclusion rested solely on the "presumptively lawful" passage in *Heller*; it was not rooted in a *Chester*-step-one determination that felons are outside "the scope of the Second Amendment as historically understood."  628 F.3d at 680; *see Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017) ("The streamlined portion of the analysis as explained in *Moore* is that for a presumptively lawful regulation . . . we need not undertake an extensive historical inquiry to determine whether the conduct at issue was understood to be within the scope of the Second Amendment at the time of ratification.").  As explained above, however, *Bruen* makes clear that

uncritical deference to *Heller*'s "presumptively lawful" language is no longer proper.  Instead, courts must subject every type of firearm regulation covered by the Second Amendment—even those on *Heller*'s "presumptively lawful" list—to rigorous scrutiny to determine whether they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Because the Fourth Circuit has never conducted that historical inquiry—or held the government to its burden to demonstrate a "historical tradition" in this country—for felon-disarmament laws, its pre-*Bruen* cases do not resolve Mr. Lane's challenge.

## II.     The Second Amendment's plain text protects the right of "the people," not only "law-abiding, responsible" people, to keep and bear arms.

The government has argued that "the people" comprises only law-abiding people.  *See* ECF No. 28 at 13-17.  This argument derives from a comment *Heller* made when determining the proper standard of review for Second Amendment claims.  In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people."  554 U.S. at 634-35.  Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.*  And regardless, the *Heller* Court wrote, "***whatever else*** [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 635 (emphasis added).  This latter sentence, the government's argument goes, limits the right to keep and bear arms to "law-abiding, responsible citizens."

This argument misreads *Heller*.  By beginning the quoted passage with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling.  The *Heller* Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address

whether—much less rule out the conclusion that—other people have that right, too.  Rather, it expressly left that question "to future evaluation."  *Id.*; *see also Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) ("The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear. . . . *Heller*'s dictum does not settle the question before us.").  *Heller*'s "law-abiding" statement was not meant to amend, sub silentio, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580.

Heller "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens at the very least." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018). *Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, *id.*; it merely establishes that certain people do fall within the amendment's reach.  *See United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *8 (W.D. Tex. Nov. 10, 2022) (explaining *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'").  "The Constitution's text, at least, has as little to say about restrictions on firearm ownership by felons as it does about the trimesters of pregnancy."  J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 273 (2009).

Heller's qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity.  The passage in *Heller* references law-abiding, responsible citizens' right to use arms "in defense of hearth and home."  If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms outside the home.  But *Bruen* held that the Second Amendment right does extend outside the home, and the Supreme Court in *Bruen* gave no hint it believed it was contradicting

9

*Heller* in that regard. Thus, *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

The government argues that other portions of *Bruen* demonstrate Second Amendment rights are "limited" to law-abiding citizens. It is true that at several points, *Bruen* describes its holding by using the term "law-abiding." *See, e.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.").

But *Bruen* repeated the "law-abiding" label because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Id.* at 2124-25. No other questions were before the Court in *Bruen*, and at no point did the Supreme Court say Second Amendment rights are limited to law-abiding citizens. *See Range*, 69 F.4th at 101 ("First, the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were dicta."); *Bullock*, 2023 WL 4232309, at *29 (dismissing law-abiding language as "dicta"); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position."); *United States v. Ware*, No. 22-CV-30096-SPM, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023) ("The language 'law-abiding' as used in both *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases."); *United*

*States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *4 n.20 (W.D. Okla. Feb. 3, 2023) ("*Bruen* noted that it was undisputed that the plaintiffs in that case were part of the people protected by the Second Amendment, so at best, the [government] is relying on dicta.  But even so, the [government] is reading too much into the dicta because immediately after describing the plaintiffs, the *Bruen* Court cited *Heller*'s holding that 'the people' includes 'all members of the political community,' not just 'an unspecified subset.'").

Indeed, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'all Americans.'"  142 S. Ct. at 2156 (emphasis added) (quoting *Heller*, 554 U.S. at 581).  That statement cannot be reconciled with the government's view that *Bruen* (implicitly) limits the arms right to law-abiding citizens.  *Bruen* also repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning."  *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576).  There is nothing normal or ordinary about reading "the people" to mean "law-abiding people."  The government's argument stretches too far.  *Bruen* held "that ordinary, law-abiding citizens have [the] right to carry handguns publicly for their self-defense."  *Id.* at 2122.  If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too.  But surely the government does not believe unordinary citizens lack Second Amendment rights.  The Supreme Court cannot have meant to exclude anyone deemed abnormal from exercising a fundamental, enumerated constitutional right.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102; *see also Bullock*, 2023 WL 4232309, at *29 (same).  As the Fifth Circuit has observed, that phrase:

> admits to no true limiting principle.  Under the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people— however expediently defined—from the scope of the Second Amendment.  Could speeders be stripped of their right to keep and bear arms?  Political nonconformists?

> People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that 'the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (holding 18 U.S.C. § 922(g)(8) facially unconstitutional). Thus adopting a "law-abiding, responsible citizens" limitation "devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69 F.4th at 102. That approach—which "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label"—conflicts with *Bruen*'s "warning against 'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting 142 S. Ct. at 2131).

Mr. Lane, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the Second Amendment. The Second Amendment thus presumptively protects his right to keep and bear arms.

### III.   The government has not shown that § 922(g)(1) is consistent with the United States' historical tradition of firearm regulation.

To rebut the presumption of § 922(g)(1)'s unconstitutionality, the government must demonstrate that a challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The threshold question in *Bruen*'s historical inquiry is whether the problem addressed by § 922(g)(1) is longstanding or of more recent provenance. The answer is clear: the "general societal problem" at which § 922(g)(1) is directed— i.e., felons' access to guns—"has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Id.*; *see Harrison*, 2023 WL 1771138, at *6 ("[T]he United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)—which *Bruen* suggests is dispositive."); *Worth v. Harrington*, ___ F. Supp.

12

3d ___, 2023 WL 2745673, at \*16 (D. Minn. Mar. 31, 2023) (dismissing state's proffered historical analogues because they "do not burden the Second Amendment right in a manner distinctly similar to the age requirement Minnesota's permit-to-carry law").

Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one.  The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'"  142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1).  This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard.  *See id.* at 2123-24 & n.2.  In a challenge to § 922(g)(1), then, a "distinctly similar" historical regulation would be one that either denied or substantially abridged felons' access to firearms.  But no such statutes appear in the 18th- or 19th-century record.

Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified."  *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012).  In 2007, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815."  Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007).  Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic."  *Id.* at 142.  Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing

firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?,* 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar).

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

## IV.    The Court should reject the government's efforts to define the relevant historical tradition at a high level of generality.

The government has argued § 922(g)(1) is constitutional because it fits within a supposed historical tradition permitting legislatures to take firearms away from "dangerous" or "unvirtuous" people, or people who demonstrated "disrespect for the law." The government seeks to support

this argument by citing founding-era laws[6] disarming Native Americans, certain religious minorities, and citizens who refused to swear a loyalty oath to the state. Based on these disparate regulations of discrete groups, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of any group whom a legislature might rationally deem "dangerous" or "unvirtuous," even if that specific group (such as felons) was never disarmed at the founding.

This argument operates at too high a level of generality. *Bruen* demonstrates that in carving out exceptions to "the Second Amendment's unqualified command," *id.* at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely, to ensure they are in fact consistent with America's historical tradition of firearm regulation.

In *Bruen*, to support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The *Bruen* Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138. New York could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

---

[6] The government also relies on English common laws applicable to the colonies before the Revolutionary War and the creation of our country. But, "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 142 S. Ct. at 2136. "English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns." *Id.* at 2142. The Second Amendment's "central component," after all, is protecting an individual's right to self-defense. *Id.* at 2133.

The *Bruen* Court held that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry.  The Supreme Court's historical survey revealed a few "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied).  *Id.* at 2138.  But that's all.  New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly.

Thus, *Bruen* dooms any effort to carve out Second Amendment exceptions for groups labeled "dangerous," "unvirtuous," or "disrespectful of the law."  That effort relies on a few founding-era statutes disarming specific groups (slaves, Native Americans, certain religious minorities, and disloyal subjects), from which the government gleans the broader principle that "dangerous" or "unvirtuous" groups, in general, do not enjoy the right to keep and bear arms.  This is exactly the maneuver the Supreme Court rejected in *Bruen*; after *Bruen*, the government cannot identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying arms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to all conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause").  *See Harrison*, 2023 WL 1771138, at *19 n.134 (holding government cannot use this "trick" to disarm "whole new classes of people" who "aren't remotely the sort of persons that were historically regulated"); *Range*, 69 F.4th at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today.  And any such analogy would be 'far too broad.'" (quoting *Bruen*,

142 S. Ct. at 2134)); *cf. United States v. Power*, No. 20-PO-331-GLS, 2023 WL 131050, at *10 (D. Md. Jan. 9, 2023) ("As the Supreme Court cautioned, '[e]verything is similar in infinite ways to everything else.'  So, the Court must avoid finding that analogies are 'relevantly similar' where the connection is overly superficial or general." (quoting *Bruen*, 142 S. Ct. at 2132)).

The Second Amendment exceptions that this approach would produce are grossly overbroad.  Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined."  *Bruen*, 142 S. Ct. at 2156.  Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the right to keep and bear arms.  *Id.* at 2134; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").  These terms not only lack a "clear limiting principle," they lack any limiting principle at all.  *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out broad new category of speech unprotected by the First Amendment) (emphasis added); *see also Bruen*, 142 S. Ct. at 2130 (analogizing Second Amendment to First Amendment).

To defend § 922(g)(1), the government cannot rely on unbounded descriptors like "dangerous" and "disrespect for the law."  Instead, it must descend into particulars[7].

---

[7] As the *Range* court observed, even though "founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue–lifetime disarmament–is rooted in our Nation's history and tradition."  *Range*, 69 F.4th at 105.  More so, after completing a sentence, a felon was allowed to "repurchase arms," and thus §922(g)(1) is not "relevantly similar" to earlier statutes.  *Id.*  There were laws that required forfeiting one's guns but "government confiscation of the instruments of a crime . . . differs from a status-based lifetime ban on firearm possession."  *Id.*  The *Range* court added that "even arms used to commit crimes bordering on treason were sometimes returned to the perpetrators during the Founding era."  *See id.* at 106 n.10.

**V.**    ***The government has not shown that the United States has a historical tradition of regulating self-defense weapons like Mr. Lane's alleged possession of a handgun with an auto sear here.***

The government's response to Mr. Lane's Second Amendment challenge to 18 U.S.C. § 922(o) simply ignores several important points of fact and law.

First, the government asserts that no one in the United States can legally possess a machine gun. *See* ECF No. 28 at 27. Title 18 section 922(o) of the United States Code makes clear that its ban on possession of machineguns is far from complete. Section 922(o)(2) provides:

> (2)  This subsection does not apply with respect to—
>
> > (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> > (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2). In fact, as of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives[8]. As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States[9]. As of either 2015 or 2016, the Bureau of Alcohol, Tobacco, Firearms and Explosives had just under 500,000 legally registered machine guns in its database. *See* Ex. B. These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress enacted 18 U.S.C. 922(o), but has in fact grown by more than 150%.

---

[8] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15–16 (2021), *available at* https://www.atf.gov/file/149886/download.

[9] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, 15–16 (2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

Second, the government argues that the threshold for a weapon (or related item) to qualify as "common" is 50,000,000.  *See* ECF No. 28 at 26-27.  That number certainly reflects a common weapon, but is by no means a mandatory floor for determining what is an "unusual" weapon.  The record in *Caetano v. Massachusetts* reflected that civilians owned about 200,000 stun guns, which Justices Alito and Thomas found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense."  577 U.S. 411, 420 (2016) (Alito, J., concurring) (fleshing out facts that per curiam decision rejecting ban on stun guns omitted); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use").

Third, the government mistakes the stages of the Court's analysis of Mr. Lane's challenge to § 922(o).  The government argues that machine guns do not constitute "arms" under the Second Amendment.  *See* ECF No. 28 at 26-27.  *Heller* found, however, that all arms are protected by the Second Amendment, and under *Bruen*, the question is rather whether there is an historical tradition of restricting them.  *See Heller*, 554 U.S. at 582 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); *Bruen*, 142 S. Ct. at 2132 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense").  The government argues that whether a firearm is "dangerous" or "unusual" is in fact the ultimate question at both steps—i.e., it determines whether

19

the conduct is protected by the Second Amendment and whether there is a historical tradition of similar restrictions.  That position after *Bruen* is, of course, untenable.

Because machine guns, particularly a handgun with an auto sear (commonly called a "Glock switch") are bearable arms, the Second Amendment's plain language covers possession of such guns.  *See Heller*, 554 U.S. at 584 (finding that to bear arms means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person"); *see also Kolbe v. Hogan*, 849 F.3d 114, 125, 129 n.7 (4th Cir. 2017) (en banc), *abrogated by Bruen*, 142 S. Ct. 2111 (observing that semi-automatic and fully automatic weapons are "virtually indistinguishable"; discussing evidence showing that nearly a third of all assault rifle purchasers buy those guns for self-defense).  The question of "common use," is thus properly considered in step two of *Bruen*: whether the arm at issue falls under the historical tradition in the United States of regulating "dangerous and unusual" weapons.  Because the government has made no persuasive showing that machinegun possession is unusual in this country, the Court should invalidate § 922(o).

## CONCLUSION

As set forth above and in ECF No. 21, the Court must dismiss the indictment in this case as Mr. Lane's prosecution violates his Second Amendment right to keep and bear arms.

Respectfully submitted,
DAI'QUAN JARRVEL LANE

By:  _____/s/_____
     Laura Koenig
     Va. Bar No. 86840
     Counsel for Defendant
     Office of the Federal Public Defender
     701 E Broad Street, Suite 3600
     Richmond, VA 23219-1884
     Ph. (804) 565-0881

Fax (804) 648-5033
laura_koenig@fd.org