IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA          )
                                  )
        v.                        )        Criminal Action No. 3:23cr62 (RCY)
                                  )
DAI'QUAN JARRVEL LANE,            )
        Defendant.                )
                                  )

## MEMORANDUM OPINION

This matter is before the Court on Defendant Dai'Quan Jarrvel Lane's Motion to Dismiss the Indictment.  The Defendant seeks dismissal of the indictment charging him with one count of Possession of Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), and one count of Possession of a Machinegun, in violation of 18 U.S.C. § 922(o), based on the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, --- U.S. ----, 142 S. Ct. 2111 (2022).  The Defendant brings both facial and as-applied challenges to §§ 922(g)(1) and 922(o). For the reasons stated below, the Court will deny the Defendant's motion in full.

## I. FACTUAL BACKGROUND

Defendant Dai'Quan Jarrvel Lane is a rap music artist born and raised in Richmond, Virginia.  Mot. Dismiss Indictment 3, ECF No. 21.

On March 1, 2021, Mr. Lane was convicted of Felony Perjury, in violation of Va. Code Ann. § 18.2-434.[1]  *Id.* at 3, 3 n.2; Def.'s Reply 1, ECF. No 34.  As a result of that conviction, Mr.

---

[1] Section 18.2-434 reads:

If any person to whom an oath is lawfully administered on any occasion willfully swears falsely on such occasion touching any material matter or thing, or if a person falsely make oath that any other person is 18 years of age or older in order to obtain a marriage license for such other person, or if any person in any written declaration, certificate, verification, or statement under penalty of perjury pursuant to § 8.01-4.3 willfully subscribes as true any material matter which he does not believe is true, he is guilty of perjury, punishable as a Class 5 felony. Upon the conviction of any person for perjury, such person thereby shall be adjudged forever incapable of holding any office of honor, profit or trust under the Constitution of Virginia, or of serving as a juror.

Lane was sentenced to five years in prison, with four years, eleven months, and twenty-nine days of that prison sentence suspended.  Def.'s Reply 2.

On February 1, 2023, Mr. Lane was playing one of his recordings live on Instagram.  Mot. Dismiss Indictment 3; Gov't's Resp. 2, ECF No. 28.  During the livestream, Mr. Lane displayed what appeared to be a firearm.  Mot. Dismiss Indictment 3; Gov't's Resp. 2.  A Richmond Police Department ("RPD") officer was watching the livestream.  Mot. Dismiss Indictment 3; Gov't's Resp. 2.  Knowing that Mr. Lane had a prior felony conviction for perjury, that officer and other RPD officers went to where they believed that Mr. Lane might be.  Mot. Dismiss Indictment 3; Gov't's Resp. 2.  When the RPD officers approached Mr. Lane and attempted to engage with him, Mr. Lane turned and ran away.  Mot. Dismiss Indictment 3; Gov't's Resp. 2.  The officers eventually caught up to Mr. Lane and arrested him.  Gov't's Resp. 2.

RPD searched the area where Mr. Lane fled.  Mot. Dismiss Indictment 3; Gov't's Resp. 2.  Somewhere along Mr. Lane's path of flight, RPD officers recovered a Glock-style handgun with a machinegun conversion device (known as a "switch") attached to the firearm.  Gov't's Resp. 1–2; *see* Mot. Dismiss Indictment 3.  The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") calls this a "Glock switch."  Mot. Dismiss Indictment 3.  The firearm that RPD officers recovered was loaded with 20 rounds of ammunition.  Mot. Dismiss Indictment 3; Gov't's Resp. 3.  The firearm that RPD recovered was not the same firearm displayed in Mr. Lane's livestream.  Mot. Dismiss Indictment 3; Gov't's Resp. 3.

According to an ATF examination, the recovered firearm with the "Glock switch" installed was able to fire multiple bullets with a single pull of the gun's trigger.  Mot. Dismiss Indictment 3; Gov't's Resp. 3.  Thus, according to the ATF, the "switch" converted the handgun into a machinegun under federal gun laws.  Mot. Dismiss Indictment 3–4; Gov't's Resp. 3.

After his arrest, Mr. Lane made some post-*Miranda* statements to the police.  Gov't's Resp. 3; *see* Mot. Dismiss Indictment 3.  In those statements, Mr. Lane admitted that he is a convicted felon.  Gov't's Resp. 3; *see* Mot. Dismiss Indictment 3.  He admitted that he had found the recovered firearm months before the present arrest.  Gov't's Resp. 3; *see* Mot. Dismiss Indictment 3.  He also admitted that he knew that the "Glock switch" made the gun fire in a fully automatic manner.  Gov't's Resp. 3; *see* Mot. Dismiss Indictment 3.

## II. PROCEDURAL HISTORY

On May 17, 2023, a grand jury indicted Mr. Lane pursuant to: (1) 18 U.S.C. § 922(g)(1) for knowingly possessing 20 rounds of assorted ammunition which affected interstate commerce, after previously having been convicted for a crime punishable by imprisonment for more than one year; and (2) 18 U.S.C. § 922(o) for knowingly possessing a machinegun—specifically, a Glock-style handgun affixed with a "switch" or "auto sear" which converted the Glock into a weapon that can fire multiple rounds with a single function of the trigger.  Indictment, ECF No. 14; Mot. Dismiss Indictment 3–4, ECF No. 21; Gov't's Resp. 1–2, ECF No. 28.

Mr. Lane was arraigned on May 31, 2023, and filed the instant Motion to Dismiss the Indictment on June 16, 2023, seeking dismissal of both counts.  Mot. Dismiss Indictment.  The Government filed its Opposition to the Motion to Dismiss on July 14, 2023.  Gov't's Resp.  The Defendant filed his Reply on July 21, 2023.  Def.'s Reply, ECF No. 29.

On August 3, 2023, the Court held a status conference with the parties where it scheduled a hearing on the instant motion.  The parties stated that they did not seek to adduce evidence and only argument was needed.  At the conclusion of the status conference, the Court ordered that the parties jointly file a document containing: (1) the statutes that the Defendant was convicted of that make him a prohibited person; (2) the date of the Defendant's underlying convictions; and (3) any

other relevant information regarding the Defendant's prior convictions.  On August 10, 2023, the parties filed the joint filing.  Parties' Stipul. Facts, ECF No. 34.

The motion hearing occurred on August 11, 2023, at the conclusion of which the Court took the matter under advisement, pending issuance of a formal written opinion.

### III. LEGAL STANDARD

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  The Defendant brings facial and as-applied challenges to the constitutionality of both § 922(g)(1) and § 922(o), arguing that they violate the Second Amendment.

### A. Facial vs. As-Applied Challenges

"To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which the Act would be valid.'"  *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  "Because of this stringent standard, a facial challenge is perhaps 'the most difficult[2] challenge to mount successfully.'"  *Hosford*, 843 F.3d at 165.  A party ordinarily "can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [law] would be valid,' i.e., that the law is unconstitutional in all of its applications."  *Wash. State Grange*, 552 U.S. at 449 (first alteration in original) (quoting *Salerno*, 481 U.S. at 745).

---

[2] "Facial challenges are disfavored for several reasons."  *Wash. State Grange*, 552 U.S. at 450.  Among them, "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."  *Id.* at 451.  "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  *Id.* (citation omitted).  Further, facial challenges "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records."  *Id.* at 450.  The Supreme Court generally disfavors facial challenges because they "often rest on speculation," can lead courts unnecessarily to anticipate constitutional questions or formulate broad constitutional rules, and may prevent governmental officers from implementing laws "in a manner consistent with the Constitution."  *See id.*

"An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well, but it also requires that there be "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied." *United States v. Mgmt. Consulting, Inc.*, 2022 WL 14151606, at *6 (E.D. Va. Oct. 24, 2022) (quoting *Salerno*, 481 U.S. at 745).

**B. The Second Amendment**

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

1.  The Pre-*Bruen* Framework

After *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), most of the federal Courts of Appeals (including the Fourth Circuit) adopted a two-step approach to evaluate Second Amendment challenges.  The first question to be addressed was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *United States v. Chester*, 628 F.3d 673, 681 (4th Cir. 2010).  Such an inquiry sought "to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid."  *Id.*  However, if the challenged regulation burdened conduct that was within the scope of the Second Amendment as historically understood, then courts would move to the second step: applying means-end scrutiny—either strict scrutiny or intermediate scrutiny (rational basis review was not permitted).  *See id.*  The applicable level was identified based on the nature of the conduct being regulated and the degree to which the challenged law burdened the right to keep and bear arms.  *See id.*

5

2. The *Bruen* Framework

In the recent case of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court summarily rejected the second, means-end scrutiny step of the old framework.  142 S. Ct. at 2127.  The *Bruen* majority crafted a new two-step test, which is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30.

*Bruen*'s step one is a threshold inquiry.  It requires a textual analysis to determine whether "the right of the people to keep and bear Arms," U.S. Const. amend. II., covers the conduct at issue.  *See Bruen*, 142 S. Ct. at 2130.

Only if a reviewing court answers that question in the affirmative does it proceed to *Bruen*'s step two.  There, the government bears the burden to prove that the regulation prohibiting the protected conduct "is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  To meet that burden, the Government must identify "a well-established and representative historical analogue" of the modern regulation at issue.  *Id.* at 2133 (emphasis omitted).

## IV. DISCUSSION

### A.  § 922(g)(1)

18 U.S.C. § 922(g)(1) makes it "unlawful for any person" convicted of "a crime by imprisonment for a term exceeding one year" to possess "any firearm or ammunition."[3]

---

[3] In full, § 922(g)(1) reads:

It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate of foreign commerce.

The Defendant launches facial and as-applied constitutional attacks to § 922(g)(1). But the Defendant makes the same argument for both: § 922(g)(1) facially criminalizes possessing a firearm or ammunition as a felon. And the statute applies to the Defendant because he was a felon possessing a gun or ammunition (in this case, ammunition). Because the Defendant argues both challenges in the same way—using *Bruen*'s framework, *see* Mot. Dismiss Indictment 7–19, ECF No. 21; Def.'s Reply 8–17, ECF No. 29—the Court can collapse the two challenges into a single analysis.

    1.  <u>Bypassing *Bruen*</u>

The Government argues that this Court need not engage in a *Bruen* analysis to rule on the Defendant's § 922(g)(1) challenge, for two reasons. First, the Government argues that the Supreme Court's statements in *Heller* that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and that such prohibitions are "presumptively lawful regulatory measures" bind this Court and are dispositive. *See* Gov't's Resp. 5–7, ECF No. 28 (citing *Heller*, 554 U.S. at 626–27, 627 n.26). Second, the Government contends that the Fourth Circuit's pre-*Bruen* cases holding that § 922(g)(1) is constitutional survive *Bruen* and bind this Court. *See id.* at 7–10. Naturally, the Defendant resists both arguments. The legal standards for resolving these two arguments vary in important respects. The Court addresses each argument in turn.

    a.  Heller*'s Dicta*

The statement from *Heller* that the Government points the Court to reads as follows:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

7

554 U.S. at 626–27.  A footnote directly follows the statement and reads: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 570 n.26.

As an important threshold matter, contrary to the Government's assertion, these statements from *Heller* do not constitute *Heller*'s holding.   "To be sure, the language [regarding the constitutionality of felon-in-possession laws] in *Heller* . . . is merely dicta."  *United States v. Ingram*, 623 F. Supp. 3d 660, 663 (D.S.C. 2022); *see also, e.g.*, *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (calling it *Heller*'s "oft-quoted dicta"); *United States v. Bullock*, --- F.Supp.3d ----, 2023 WL 4232309, at *17–19 (S.D. Miss. June 28, 2023).  In fact, *Heller*'s holding was that the Second Amendment confers an individual, rather than a collective (that is, militia-based), right to keep and bear arms.  *See Heller*, 554 U.S. at 595; *see also id.* at 579–81.  "[T]he people" to whom the Second Amendment confers the right to bear arms, the *Heller* Court explained, "unambiguously refers to all members of the political community, not an unspecified subset" (such as just those people in the militia).  *Id.* at 580.

In this circuit, lower courts "are not bound by dicta or separate opinions of the Supreme Court."  *Myers v. Loudoun Cnty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005).  But lower courts "cannot ignore the Supreme Court's explicit guidance simply by labeling it 'dicta.'"  *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021).  Lower courts are "obliged to afford 'great weight to Supreme Court dicta,'" *id.* at 347 (quoting *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016)), and they "routinely" give "controlling deference to dicta from the Supreme Court."  *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc).  The Fourth Circuit has suggested that if dicta is not "necessary to the outcome" or is "'peripheral' or so cursory as to suggest the Court gave less than 'full and careful consideration' to the matter," it may be permissible for a court to not so readily defer to that dicta.  *See Hengle*, 19 F.4th at 346–47

(choosing ultimately to follow Supreme Court dicta after explaining that "[a]lthough the Court's extended discussion . . . may not have been strictly 'necessary to the outcome' . . . , neither was it 'peripheral' or so cursory as to suggest the Court gave less than 'full and careful consideration' to the matter"). To that end, the Fourth Circuit has declined to "afford[] talismanic effect" to Supreme Court dicta that is "unaccompanied by any analysis from which [a lower court] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282–283 (4th Cir. 2008).

*Heller*'s dicta called felon-in-possession laws "longstanding," but right before saying that, the Court said that it was "not undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." 554 U.S. at 626–27. In other words, not only was the dicta "unaccompanied by any analysis from which [this Court] might gain insight into [the *Heller*] Court's reasoning" for concluding that felon-in-possession laws are "longstanding," *see Bateman*, 515 F.3d at 282, the only thing that accompanied the dicta was an admission that there was no such analysis at all. The *Heller* Court went on to say that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635. Without an "expound[ing]" "from which [this Court] might gain insight" into the dicta, this Court is hesitant to "afford[]" it "talismanic effect." *See Bateman*, 515 F.3d 282–83. Furthermore, *Heller*'s statements that felon-in-possession statutes are "longstanding" and "presumptively constitutional" were "peripheral," "cursory," and "not necessary" whatsoever to reach its holding that the Second Amendment confers an individual right to keep and bear arms. *See Hengle*, 19 F.4th at 346–47.

Not bound by *Heller*'s felon-in-possession dicta,[4] *see Myers*, 418 F.3d at 406, the Court declines the Government's invitation to dispose of the Defendant's § 922(g)(1) challenge based

---

[4] This Court notes that at least one other court in this district has concluded that *Heller*'s dicta did indeed bind it. *See United States v. Finney*, 2023 WL 2696203, at *2 n.2 (E.D. Va. Mar. 29, 2023). But as this Court understands that opinion, that court concluded that *Heller*'s dicta was binding upon it only because the Fourth Circuit

on the dicta alone.[5]  The statements are "unaccompanied by any analysis from which [this Court] might gain insight into [the *Heller*] Court's reasoning."  *See Bateman*, 515 F.3d at 282–283.  For that reason, this Court will not bypass *Bruen* by "afford[ing]" *Heller*'s felon-in-possession dicta "talismanic effect."  *See id.* at 283.

### b.   The Fourth Circuit's pre-Bruen *Precedent*

Supreme Court dicta does not bind this Court, *see Myers*, 418 F.3d at 406, but Fourth Circuit precedent does.  When the Fourth Circuit has not overruled one of its precedents, that precedent (if on point) binds this Court unless a Supreme Court decision has "specifically rejected," *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998), or "clearly undermined," *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011), that precedent.

Under this standard, the Government argues that the Fourth Circuit's pre-*Bruen* cases upholding the constitutionality of § 922(g)(1)—*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), and *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012)—remain good law and bind this Court.  The Defendant does not agree.  The Court, however, does.

First, some background.  In *Moore*, the Fourth Circuit rejected the defendant's facial and as-applied constitutional challenges to § 922(g)(1).  The court relied heavily on the fact that *Heller* had identified felon in possession laws like § 922(g)(1) as presumptively constitutional and that a

---

had relied on the dicta in two on-point cases.  As an alternative to the Government asking this Court to bypass *Bruen* based solely on *Heller*'s felon-in-possession dicta, the Government also seeks to bypass *Bruen* by relying on those Fourth Circuit cases.  The Court will address that argument on its own, next.

[5] This accords with how the only federal Courts of Appeals to confront post-*Bruen* § 922(g)(1) challenges (the Third, Seventh, and Eighth Circuits) decided their respective cases.  The Third and Eighth Circuits decided their cases on the *Bruen* text-and-history merits.  *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101-03 (3d Cir. 2023) (en banc); *United States v. Jackson*, 69 F.4th 495, 501-07 (8th Cir. 2023).  In neither case did a majority of either court conclude that *Heller*'s dicta was dispositive.  The Seventh Circuit did not ultimately rule on § 922(g)(1)'s constitutionality under *Bruen*; rather, it sent the case back to the district court for more historical briefing on the matter.  *See Atkinson*, 70 F.4th at 1022.  But the Seventh Circuit did specifically say that *Heller*'s "oft-quoted dicta" did not allow it to "sidestep *Bruen* in the way the government invite[d]."  *Id.*  Instead, the court explained that it "must undertake the text-and-history inquiry the [*Bruen*] Court so plainly announced and expounded upon at great length." *Id.*

facial challenge to such a regulation would be resolved "fairly quickly" by that "clear declaration in *Heller*." *Id.* at 317–18. The *Moore* panel "ha[d] no difficulty" concluding that 922(g)(1) is facially constitutional "[s]ince clearly there are cases where felon firearm possession is constitutionally limited." *Id.* at 319. The defendant's as-applied argument fared no better. The panel explained that the defendant "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of '*law-abiding responsible* citizens to use arms in defense of hearth and home.'" *Id.* at 319 (emphasis in original). Based on this reasoning, § 922(g)(1) was found to be constitutional as-applied as well. *See id.* at 320.

*Pruess* echoed much of *Moore* to again hold that § 922(g)(1) withstood facial and as-applied constitutional challenges. *See Pruess*, 703 F.3d at 245–47. Tracking *Moore*, *Pruess* relied on the presumption of constitutionality from *Heller*, following *Moore*'s premise that, under *Heller*, "a presumptively lawful regulation" like § 922(g)(1) "could not violate the Second Amendment unless, as applied, it proscribed conduct fall[ing] within the category of . . . *law-abiding responsible* citizens . . . us[ing] arms in defense of hearth and home." *Id.* at 245 (emphasis in original) (quoting *Moore*, 666 F.3d at 319) (internal quotations omitted). "[A]s in *Moore*," the *Pruess* panel concluded that "Pruess' conduct lies outside the scope of the Second Amendment's protection." *Id.* at 246. Notably, the *Pruess* court expanded *Moore* beyond just violent felons, "holding that application of the felon-in-possession prohibition to allegedly non-violent felons like Pruess does not violate the Second Amendment." *Id.* at 247.

Because the Fourth Circuit has never purported to overrule *Moore* and *Pruess*, the sole issue is whether those cases survive *Bruen*. Specifically, the question is whether *Bruen* "clearly undermined," *Williams*, 155 F.3d at 421, or "specifically rejected," *Qingyun Li*, 666 F.3d at 150,

the reasoning on which *Moore* and *Pruess* were based.  After a thorough review of all three cases, the Court concludes that *Bruen* did not.

*Bruen* did not specifically reject the reasoning articulated in *Moore* and *Pruess*.  The only thing *Bruen* "specifically rejected" was means-end scrutiny in the Second Amendment context. *See Bruen*, 142 S. Ct. at 2127.  Neither *Moore* nor *Pruess* employed means-end scrutiny.  *See Moore*, 666 F.3d at 316–20; *Pruess*, 703 F.3d at 245–47; *United States v. Riley*, 635 F. Supp. 3d 411, 424 (E.D. Va. 2022) ("The Fourth Circuit's binding authority on this topic did not reach its conclusion upholding the constitutionality of § 922(g)(1) by conducting a means-end analysis, but rather relied on the historical foundations of the regulation and on *Heller*'s dicta.").

Nor can this Court say that *Bruen* clearly undermined the reasoning on which *Moore* and *Pruess* were based.  *Moore* and *Pruess* relied on *Heller* to uphold § 922(g)(1)'s constitutionality. *See Moore*, 666 F.3d at 317–19; *Pruess*, 703 F.3d at 245–47.   Specifically, those panels relied on *Heller*'s dicta that felon-in-possession laws are "longstanding" and "presumptively lawful."[6] *Moore*, 666 F. 3d at 317–20; *Pruess*, 703 F.3d at 245–47; *see Riley*, 635 F. Supp. 3d at 424.  They also relied on *Heller*'s explanation that the Second Amendment protects "'the right of *law-abiding responsible* citizens to use arms in defense of hearth and home.'"  *Moore*, 666 F.3d at 319 (emphasis in original) (quoting *Heller*, 554 U.S. at 635); *see Pruess*, 703 F.3d at 245 (quoting *Moore*, 666 F.3d at 319).  Applying *Heller*, the courts in *Moore* and *Pruess* both held that the defendants' "conduct lies outside the scope of the Second Amendment's protection."  *Pruess*, 703 F.3d at 246 (explaining that its conclusion was the same one "as in *Moore*").

---

[6] The Defendant argues that this Court should not follow *Moore* and *Pruess* because, in the Defendant's view, "uncritical deference" to *Heller*'s felon-in-possession dicta is no longer proper post-*Bruen*.  *See* Def.'s Reply 7-8.  In essence, the Defendant argues that because *this Court* should not find *Heller*'s felon-in-possession dicta to be dispositive (an argument this Court agrees with), this Court should also not follow *Moore* and *Pruess* because *those courts* relied on the dicta.  But this argument simply ignores the different legal standards that this Court applies in determining whether to follow Supreme Court dicta and whether to follow a Fourth Circuit panel holding.  This Court faithfully applies those distinct legal standards to resolve the Government's respective and distinct arguments.

Despite *Bruen* changing the analytical framework for Second Amendment challenges, nothing in *Bruen* indicates that the Supreme Court has repudiated its earlier pronouncements that the Second Amendment's protections do not extend to felons.  The *Bruen* Court did not specifically walk back *Heller*'s dicta that the prohibition of firearms by felons is "longstanding" and "presumptively lawful."[7]  Nor did it disturb *Heller*'s limiting of the Second Amendment right to "law-abiding citizens."  In fact, in this Court's view, it reinforced this limitation.  *See* discussion *infra* Part IV.A.2.i.  Indeed, the *Bruen* majority noted that the holding is "in keeping with *Heller*." *Bruen*, 142 S. Ct. at 2126.  And at the August 11 motion hearing, defense counsel conceded that *Heller* remains good law after *Bruen*.

For those reasons, the Court cannot agree with the Defendant that *Bruen* frees this Court from its obligation to apply the Fourth Circuit's on-point precedents of *Moore* and *Pruess*.  Those cases pre-date *Bruen*, but *Bruen* did "specifically reject" or "clearly undermine" their holdings. The Fourth Circuit very well may decide its first post-*Bruen* § 922(g)(1) challenge differently than it did in *Moore* and *Pruess*.  But that is the Fourth Circuit's decision to make.  This Court must follow all Fourth Circuit precedent that is still good law.

*Moore* and *Pruess* control and doom the Defendant's motion to dismiss his indictment under § 922(g)(1), both facially and as-applied to the Defendant.[8]

---

[7] The Court notes that all six members of the *Bruen* Court who specifically delved into *Heller*'s "presumptively lawful" and "longstanding" felon-in-possession dicta also understood *Bruen* to not upset the dicta. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations . . . [including] '"longstanding prohibitions on the possession of firearms by felons . . . ."'" (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding [identifying "presumptively lawful" firearms regulations].") Although, as the Defendant accurately points out, these are all separate opinions that do not bind this Court, *see* Def.'s Reply 5 n.5, the Court finds that these opinions at least support its conclusion that it is not "clear[]" that *Bruen* "undermined" *Moore* and *Pruess* such that this Court can ignore those cases. *See Williams*, 155 F.3d at 421.

[8] The Court also notes that, to its knowledge, every other district court facing this issue within the Fourth Circuit has reached the same conclusion—*Moore* and *Pruess* remain good and binding law. *See, e.g.*, *Riley*, 635 F. Supp. 3d at 428 ("[T]his Court concludes that the Fourth Circuit's decisions in *Moore* and *Pruess* remain good law and control the disposition of Defendant's motion to dismiss."); *United States v. Bever*, --- F. Supp. 3d ----, 2023 WL

2.  Applying *Bruen*

Even if this Court concluded that *Moore* and *Pruess* did not bind it, it would make no difference in the outcome.  Applying *Bruen*'s text-and-history standard, "§ 922(g)(1) pass[es] *Bruen* muster."  *Riley*, 635 F. Supp. 3d at 424.

The Second Amendment protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  "A plain reading of the text demonstrates that 'the people' remains limited to those within the political community and not those classified as felons."  *Riley*, 635 F. Supp. 3d at 424.  Thus, "the Second Amendment's plain text" does *not* cover the possession of firearms or ammunition by felons like the Defendant.  *See Bruen*, 142 S. Ct. at 2126.

a.  *Step One: Plain Text*

At *Bruen*'s step one, this Court must determine whether the conduct that § 922(g)(1) proscribes (that is, the Defendant's conduct) is conduct that the plain text of the Second Amendment covers.  *Id.*

The conduct that § 922(g)(1) prohibits is the possession of ammunition or a firearm by a felon.  (The Defendant's conduct was possessing the ammunition in his Glock-style handgun as a felon.)  The conduct the Second Amendment protects is the "keep[ing] and bear[ing of] Arms" by "the people."  U.S. Const. amend. II.  The Court concludes that the Second Amendment's text does not cover the conduct that § 922(g)(1) proscribes because felons are not among "the people" whose conduct the amendment protects.  Plainly, felons like the Defendant are not "members of the political community."  *Heller*, 554 U.S. at 579–80.  *Bruen*, *McDonald*, and *Heller* tell us that only

---

2991870, at *5 (S.D.W. Va. Apr. 18, 2023) ("This court remains convinced that nothing in *Bruen* upsets the Fourth Circuit's decision in *Moore* upholding the constitutionality of 18 U.S.C. § 922(g)(1)."); *Finney*, 2023 WL 2696203, at *3 ("[T]he Court finds that *Moore* and *Pruess* remain good law and bind the Court in this case."); *United States v. Robinson-Davis*, 2023 WL 2495805, at *3 (W.D. Va. Mar. 14, 2023) ("[T]his court must conclude that the Fourth Circuit decisions in *Moore* and *Pruess*, both of which affirmed the constitutionality of § 922(g)(1) after *Heller*, remain good law and require denial of Defendant's motion.").  And after thoroughly reviewing the question itself, "[t]his Court finds no ground to be the first" to diverge.  *Riley*, 635 F. Supp. 3d at 428.

14

"law-abiding citizens" are. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2138, 2150, 2156; *McDonald*, 561 U.S. at 790; *Heller*, 554 U.S. at 625, 635.

In *Heller*, the Court defined "the people" in the Second Amendment as "all members of the political community." 554 U.S. at 579–80. And *Heller* described the "core" of the Second Amendment right as the "right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." *Id.* at 634–35 (emphasis added). As defense counsel admits, *Bruen* reaffirmed *Heller*. To use *Bruen*'s terms, it "reiterate[d]" and "ke[pt] with" *Heller*'s constitutional ruling. *Bruen*, 142 S. Ct. at 2126, 2129; *see also Ingram*, 623 F. Supp. 3d at 663 ("*Bruen* clarified and 'reiterated[,]' rather than modified, the constitutional ruling in *Heller*.").

*Bruen*, citing *Heller* throughout, constantly focused on "law-abiding citizens" in its opinion. *See* 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2138, 2150, 2156. Notably, *Bruen* did so (1) in how it defined *Heller* and *McDonald*'s holdings and (2) in how it defined and limited its own. *Bruen*'s opening line states: "In *District of Columbia v. Heller*, and *McDonald v. Chicago*, we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding citizen* to possess a handgun in the home for self-defense." *Bruen*, 142 S. Ct. at 2122 (emphasis added). And *Bruen*'s ultimate holding was that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156 (emphasis added).

*Bruen* also used "law-abiding citizens" to caveat (1) its explanation of how lower courts should apply its text-and-history test and (2) its own application of the text-and-history test. Shortly after *Bruen* rejected means-end scrutiny in Second Amendment context, the Court explained how to conduct the historical analysis of the tradition of firearm regulation. The majority explained:

> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that

15

*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a *law-abiding citizen's* right to armed self-defense.

*Id.* at 2132–33 (emphasis added). This language suggests that a court only conducts the step two historical analysis to see if a historical regulation burdens a "law-abiding citizen's" Second Amendment right. In other words, a court need not go beyond step one (that is, the Second Amendment's text) if "an individual's conduct" that the court is faced with is not that of a "law-abiding citizen."

The *Bruen* majority's own application of step one supports this hypothesis. The majority concluded that "[t]he Second Amendment's plain text . . . presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense" because "[i]t is *undisputed* that petitioners Koch and Nash—*two ordinary, law-abiding, adult citizens—are part of "the people"* whom the Second Amendment protects." *Id.* at 2134–35 (emphasis added). The *Bruen* Court only reached step two because it was undisputed that the petitioners were "ordinary, law-abiding, adult citizens" and thus among "the people."[9]

*Bruen*'s footnote 9 also lends credence to this Court's reading. In footnote 9,[10] the majority made clear that it was casting no constitutional doubt on so-called "shall-issue" licensing regimes

---

[9] At this point, the Defendant notes that other courts have resisted this line of reasoning. Those courts have deemed this language merely a description of the petitioners that means nothing more, and those courts have concluded that "the people" in the Second Amendment refers to "all Americans." *See* Def.'s Reply 11-12 (quoting *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023)). But this Court respectfully disagrees. If the *Bruen* petitioners' "law-abiding" status was not relevant to their inclusion in the definition of "the people," why did the Court go out of its way to mention it? If "the people" really does mean "all Americans" as the Defendant suggests (the Court addresses this argument in more detail below), then the *Bruen* Court did not have to mention that the petitioners were "ordinary," or that they were "law-abiding," or, for that matter, that they were "adult[s]." *See Bruen*, 142 S. Ct. at 2134. The Court cannot agree with the Defendant that it can glean nothing from the *Bruen* majority's conspicuous placement of the "law-abiding citizen" qualification smack-dab in the middle of its debut of step one of its text-and-history test.

[10] Footnote 9 reads:

To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, *they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry*. *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Rather, it appears that these shall-issue regimes,

16

(as contrasted to New York's unconstitutional "may-issue" regime). *Id.* at 2138 n.9. The majority's rationale for not disturbing "shall-issue" regimes was that they did not prevent "law-abiding, responsible citizens" from obtaining firearms. *Id.* In fact, the Court noted that "shall-issue" regimes are constitutional because they are designed to ensure that only "law-abiding, responsible citizens" have firearms. *Id.*

The Defendant asks the Court to disregard all the "law-abiding citizen" language in *Bruen*, *Heller*, and *McDonald* because, in the Defendant's view, it is all dicta. *See* Def.'s Reply 10–11 (citing cases to that effect). The Court declines the invitation.[11] "Considering *Bruen*'s constant qualification that its analysis operates within the context of 'law-abiding, responsible citizens,' the dicta in *Heller* and *McDonald* still define the outer bounds of 'the people' who may enjoy an uninhibited right to bear arms under the Second and Fourteenth Amendments." *Riley*, 635 F. Supp.

---

> which often require applicants to undergo a background check or pass a firearms safety course, *are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Id.* at 2138 n.9 (emphases added).

[11] In fact, some of the authority the Defendant has provided this Court undermines this argument. On the day of the motion hearing, defense counsel submitted to this Court a copy of the Fifth Circuit's recent decision in *United States v. Daniels*, --- F.4th ----, 2023 WL 5091317 (5th Cir. Aug. 9, 2023). The Defendant relied on *Daniels* in his *Bruen* step two argument. But the Government correctly pointed out that it undercuts the Defendant's argument at *Bruen* step one. *Daniels* dealt with a challenge to § 922(g)(3), and the defendant was a "marijuana user." *Id.* at *4. Although the *Daniels* panel downplayed the "law-abiding citizen" label as it applied to Daniels, the panel explained that:

> when *Heller* and *Bruen* used the phrase "law-abiding," it was just "short-hand" to "exclude from the . . . discussion" the mentally ill and *felons*, people who were historically "stripped of their Second Amendment rights." All others are presumptively included in the Second Amendment's ambit. *Because Daniels is not a felon* or mentally ill, *Rahimi*'s treatment of the "law-abiding" moniker suggests that he has presumptive Second Amendment rights as well.

*Id.* (emphases added) (internal citations omitted). Accordingly, even *Daniels* recognized that felons are outside of the Second Amendment's scope.

3d at 424–25.  And whereas *Heller*'s "presumptively lawful" felon-in-possession dicta was entirely "peripheral," "cursory," and wholly "[un]necessary to the outcome," *Hengle*, 19 F.4th at 346, the same cannot be said for *Heller*, *McDonald*, and *Bruen*'s "law-abiding citizen" throughline.  *Bruen* specifically focused on "law-abiding citizens" in (1) defining the holdings in *Heller* and *McDonald*; (2) outlining how lower courts should apply its text-and-history test; and (3) applying its text-and-history to the facts of the case to reach its ultimate holding.  *See Bruen*, 142 S. Ct. at 2122, 2132–33, 2134–35, 2156.  So even accepting the Defendant's "dicta" label for the Supreme Court's "law-abiding citizen" stipulations does not allow this Court to "ignore the Supreme Court's explicit"—and *repeated*—guidance.  *Hengle*, 19 F.4th at 346.

The plain reality of felons' rights in American society supports *Bruen* and *Heller*'s instruction that felons are not "members of the political community."  *Heller*, 554 U.S. at 579–80. All but two states and the District of Columbia restrict felons' voting rights.  State Voting Laws & Policies for People with Felony Convictions, BRITANICA, ProCon.org (last updated on May 1, 2023), https://felonvoting.procon.org/state-felon-voting-laws/.   Only four states do not limit felons' rights to hold public office.  Restoration of Rights Project (last visited August 28, 2023), https://ccresourcecenter.org/restoration-2/.  Felons cannot serve on a jury in the federal system. *Id.*  All fifty states and the District of Columbia restrict that right as well.  *Id.*  People who do not enjoy these rights cannot be said to be among "members of the *political* community."  *Heller*, 554 U.S. at 579–80 (emphasis added).  And those from 1791 would agree.  "[A]t the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called '*political* rights.'"  *Riley*, 635 F. Supp. 3d at 425 (emphasis added) (quoting *United States v. Collette*, 630 F. Supp. 3d 841, 847 (W.D. Tex. 2022), which cited Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998)).  Felons, systematically stripped of "political rights," are simply

not "members of the political community"—neither as plainly understood now nor at the time the Second Amendment was ratified.

The Defendant launches two main arguments in response.  First, the Defendant prefers a different definition of "the people."  The Defendant contends that "the people" is not just those in the "political community."  Citing *Heller*, the Defendant asserts that "the people" means "all Americans."  *See* Mot. Dismiss Indictment 8; Def.'s Reply 11–12.  But this argument mischaracterizes *Heller*.  *Heller* only linked "the people" with "all Americans" in the narrow context of discussing whether the Second Amendment conferred an individual right or a collective, militia-based right.  *Heller*'s statement that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans" was only made right after the Court concluded that "[r]eading the Second Amendment as protecting only the right to 'keep and bear Arms' in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.'"  *Heller*, 554 U.S. at 580–81.  *Heller* articulated the prevailing interest the Second Amendment's text covers was "the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home."  *Id.* at 635 (emphasis added).  *Heller* did not hold that "the people" includes "all Americans."  *Heller* limited "the people" to "members of the political community."  *Id.* at 579–80; *id.* at 644 (Stevens, J., dissenting); *see Collette*, 630 F. Supp. 3d at 847.  And felons like the Defendant are simply not members of the political community.

Second, the Defendant insists that reading "the people" in the Second Amendment to not include felons in untenable because "the people" means the same thing throughout the Constitution and every other use of the term has been understood to encompass felons.  But strictly speaking, that is not true.  Article I, Section 2 of the Constitution confers to "the People" the right to vote in

elections for the House of Representatives.  U.S. Const. art. I, § 2.[12]  It is well-established that felons are not among those "people."

At the August 11 motion hearing, defense counsel argued in response to this point that present-day felon disenfranchisement laws are constitutional under the Fourteenth Amendment and not under an interpretation of "the people" in Article I, Section 2.  But felon disenfranchisement laws long predate the Fourteenth Amendment.  "[O]ur nation's history affirms a longstanding historical tradition from the time Congress ratified the Second Amendment to exclude those convicted of a crime from the right to vote (*i.e.*, participation in a political community)."  *Riley*, 635 F. Supp. 3d at 425.  "For example, one year after the Second Amendment's ratification, Kentucky's Constitution stated, '[l]aws shall be made to exclude from . . . suffrage those who thereafter be convicted of bribery, perjury, forgery, or other high crimes and misdemeanors.'"  *Collette*, 630 F. Supp. 3d at 849 (citing Kentucky Const. art. VIII § 1.2 (1792)).  And "Vermont's Constitution followed one year later, authorizing the removal of voting rights from those engaged in bribery or corruption during elections."  *Id.* (citing Vermont Const. Ch. II § 34 (1793)).[13]  Both as presently and originally understood, the meaning of "the people" in the Constitution does not remain consistent from provision to provision.

Another issue with which the Court and the parties grappled at the motion hearing is the relationship between "the people" in the Second and Fourth Amendments.  Both amendments confer rights to "the people," and the Government does not dispute (nor could it) that felons retain

---

[12] Section 2 of Article I reads, in pertinent part: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . ."

[13] Although two ratification-era provisions would likely be insufficient to surmount the Government's historical burden at step two of *Bruen*'s test, *see Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation. . . ."), there exist no such strictures at *Bruen* step one, where the Court must only determine what conduct "the Second Amendment's plain text covers," *id.* at 2126.  And in any event, the historical burden at step two requires showing "consisten[cy] with Nation's historical tradition of *firearm* regulation," *see id.* (emphasis added); this country's history and tradition of voting rights is an entirely different matter.

their right to be free "against unreasonable searches and seizures," U.S. Const. amend. IV,[14] after

a conviction.  The Defendant argues that "the people" in both of those amendments means the

same thing, and thus felons must be within the Second Amendment's scope.

It is not clear to the Court that the Defendant's assertion is accurate.  This question is the

subject of "ongoing debate," *see Collette*, 630 F. Supp. 3d at 848, because the Supreme Court itself

has provided differing definitions for "the people" in the Second Amendment and "the people" in

the Fourth Amendment.  The controlling case for the meaning of the Fourth Amendment is *United*

*States v. Verdugo-Urquidez*.  494 U.S. 259 (1990).  There, the Supreme Court defined "the people"

as "persons who are part of a national community."  *Id.* at 265.  *Heller*, which came 18 years after

*Verdugo-Urquidez*, defined "the people" in the Second Amendment "all members of the political

community."  *Heller*, 554 U.S. at 579–80; *id.* at 644 (Stevens, J., dissenting).  The *Heller* majority

suggested that the meaning of "the people" was the same throughout "all six other provisions of

the Constitution that mention 'the people.'"  *Id.* at 580.  But *Heller* plainly gave a different meaning

to "the people" than did *Verdugo-Urquidez*.  *See, e.g.*, *id.* at 580; *id.* at 644 (Stevens, J., dissenting)

(noting that the majority, by defining "the people" in the Second Amendment as the "members of

the political community," "reads the Second Amendment to protect a 'subset' significantly

narrower than the class of persons protected by the First and Fourth Amendments"); *Collette*, 630

F. Supp. 3d at 847 ("Justice Scalia's majority opinion in *Heller* highlighted that 'in all six other

provisions of the Constitution that mention "the people," the term unambiguously refers to all

members of the political community, not an unspecified subset.'  Yet this Court notes that Justice

Scalia slightly altered the Supreme Court's previous definition of 'the people' from *United States*

*v. Verdugo-Urquidez*." (footnote omitted)).  And it is not as if the *Heller* majority was unaware of

---

[14] The Fourth Amendment, in pertinent part, reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall be violated . . . ."

*Verdugo-Urquidez*'s "national community" definition—the *Heller* majority directly quoted it in the sentence immediately following where it announced that "the people" in the Second Amendment means only those in the "political community." *See Heller*, 554 U.S. at 580.

"Political community" and "national community" clearly mean very different things. The "political community" refers to those with political rights—that is, "law-abiding citizens." *See Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2138, 2150, 2156; *Heller*, 554 U.S. at 625, 635. The "national community" refers to those who have "developed sufficient connection with this country." *Verdugo-Urquidez*, 494 U.S. at 265. The latter definition is broader—those who commit felonies can still have a "sufficient connection with this country," *see id.*, despite losing political rights. So, according to the Supreme Court at least, "the people" in the Second and Fourth Amendments seem to mean different things.

Happily, it is not this Court's present task to reconcile *Heller* and *Verdugo-Urquidez*. Instead, it is sufficient for the Court to note that the Supreme Court has provided varying, clause- and amendment-specific definitions for "the people," as that term is used in the Constitution. Moreover, the fact that felons cannot vote—and have been excluded from voting since the Second Amendment's ratification—suffices to disprove the Defendant's contention that "the people" must mean the same thing (and must include felons) throughout the entire Constitution.[15]

---

[15] In his Motion and Reply, the Defendant cites to *Range v. Attorney General*, where the Third Circuit held, *en banc*, that felons are among "the people" in the Second Amendment. 69 F.4th at 102. The Defendant also subsequently provided as additional support a Middle District of Pennsylvania case that applied *Range* to reach the same conclusion. *See* Notice Suppl. Authorities 1–2, ECF No. 37 (citing *United States v. Quailes*, --- F. Supp. 3d. ----, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023)). These decisions do not bind this Court, of course, so this Court does not need to give any reason for choosing not to follow them. Nonetheless, this Court notes that it finds *Range*'s (and thus *Quailes*'s) reasoning unpersuasive. The *Range* majority said that felons must be among the Second Amendment's "the people" "[u]nless the meaning of the phrase 'the people' varies from provision to provision." *Id.* But as this Court has just explained, the phrase's meaning *does* vary throughout the Constitution; in some provisions, "the people" includes felons, and in others, it does not. *Compare* U.S. Const. amend. IV, *with id.* art. I, § 2. And what the *Range* court purports to be "*Heller*['s] suggest[ion]" to the contrary, *Range*, 69 F.4th at 102, i.e., that there is a consistent meaning throughout the Constitution, does not change this fact, especially given that *Heller*'s definition of the Second Amendment's "the people" differs from the Supreme Court's own controlling definition of the Fourth Amendment's "the people." *Compare Heller*, 554 U.S. at 579-80 (defining "the people" in the Second Amendment

In keeping with binding Supreme Court precedent, the Court holds that felons are not among "the people" whose conduct the Second Amendment protects. For that reason, a felon's act of possessing ammunition or a firearm is not conduct that is covered by the plain text of the Second Amendment,[16] and § 922(g)(1) is constitutional both facially and as-applied to the Defendant.[17]

The Motion to Dismiss will be denied as to Count One in the indictment.

**B.  § 922(o)**

18 U.S.C. § 922(o) makes it "unlawful for any person to transfer or possess a machinegun." The parties do not appear to presently dispute that the Defendant's "Glock switch" counts as a "machinegun" under the statute.[18]  *See* Mot. Dismiss Indictment; Gov't's Resp.; Def.'s Reply.

---

as the "members of the political community"), *with Verdugo-Urquidez*, 494 U.S. at 265 (defining "the people" in the Fourth Amendment as the "members of the national community").

[16] The Defendant has submitted opinions from other courts deciding § 922(g)(1) challenges that have concluded that the relevant conduct for *Bruen* step one purposes is not a felon's possession of ammunition or a firearm, but just possession of ammunition or a firearm generally. *See, e.g.*, Notice Suppl. Authorities 1 (citing *United States v. Forbis*, No. 4:23cr133-GKF (N.D. Okla. Aug. 17, 2023), ECF No. 37 Ex. A). Those courts have reasoned that *Bruen*'s step one requires looking only at the conduct, completely divorced from the individual, even when the application of a regulation turns on who the individual is. This Court reads *Bruen* differently. *Bruen*'s step one requires that this Court determine whether "the Second Amendment's plain text covers *an individual's* conduct." 142 S. Ct. at 2126 (emphasis added). By *Bruen*'s own terms, then, it must matter in the textual inquiry who that "individual" is.

[17] Because this Court disposes of the Defendant's § 922(g)(1) challenge at *Bruen* step one, the Court need not get into whether the government met its historical burden at step two to show a sufficiently similar historical analogue to § 922(g)(1).

[18] In their initial brief, defense counsel referred to the Defendant's "Glock switch" as "the purported machine gun." Mot. Dismiss Indictment 21. But defense counsel has appeared to drop that characterization, not mentioning it in the reply brief nor at the motion hearing. *See* Def.'s Reply. To the extent any confusion lingers about whether a "Glock switch" counts as a "machinegun" under § 922(o), the Court will clear it up. For purposes of § 922(o):

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

18 U.S.C. § 922(o).

Case 3:23-cr-00062-RCY   Document 38   Filed 08/31/23   Page 24 of 29 PageID# 342

Like he did with § 922(g)(1), the Defendant brings both a facial challenge and an as-applied challenge to § 922(o).  But here, too, the Defendant forwards identical arguments for both.  The Defendant argues that criminalizing possession of machineguns is unconstitutional under *Bruen*, and for that reason, criminalizing the Defendant's possession of a machinegun is unconstitutional.  *See* Mot. Dismiss Indictment 2, 18–21 (appearing to completely fold together the Defendant's as-applied and facial challenges to § 922(o)); Def.'s Reply 18–20 (same).  All of the statistics and legal authority the Defendant provides relate to machineguns generally; nothing in the briefing specifically addresses handguns modified by a Glock switch or otherwise provides grounds to distinguish the Defendant's facial and as-applied challenges.[19]

As the Defendant frames his challenge, the answer to whether the Defendant's possession of the Glock switch is protected by the Second Amendment will necessarily be the same as the answer to whether the possession of machineguns is protected by the Second Amendment.  For that reason, the Court concludes that the Defendant's as-applied challenge will live or die with his facial challenge.[20]  As such, this Court will resolve both challenges with a single and complete *Bruen* analysis.

    1.  <u>Applying *Bruen*</u>

The Court holds that § 922(o) withstands *Bruen*.  Dangerous and unusual weapons like machineguns do not fit within the plain meaning that the Supreme Court has ascribed to "Arms"

---

The Defendant is charged with illegally possessing a Glock-style handgun modified with a "switch."  The modification constitutes a "part[] designed and intended, for use in converting a weapon into a machinegun" and, therefore, fits the definition of machinegun under the statute.

[19] The only time the Defendant appears to suggest a distinction between the two comes in the last paragraph of his Reply, where he says: "Because machine guns, particularly a handgun with an auto sear (commonly called a "Glock switch") are bearable arms, the Second Amendment's plain language covers possession of such guns." Def.'s Reply 20.  But the Defendant provided no basis for the Court to consider handguns with an auto sear in any different light than it would consider machineguns relative to § 922(o) or the controlling case law, and the entirety of the legal arguments presented rest on references to machineguns.

[20] The Government also argues that the Defendant's facial challenge must subsume his as-applied challenge because, under § 922(o), *nobody* can possess machineguns for *any* purpose.  *See* Gov't's Resp. 27.

covered by the Second Amendment.

    *a.   Step One: Plain Text*

Yet again, the first step under *Bruen* is determining whether § 922(o) outlaws conduct covered by the Second Amendment's plain text.  Because the statute prohibits anyone—that is, even "members of the political community," *Heller*, 554 U.S. at 580—from possessing a machinegun, there is no debate that § 922(o) implicates the rights of "the people."  The only question this Court must answer at this stage, then, is whether the "right to keep and bear Arms" covers possessing a machinegun such as a Glock switch.  The Court holds that it does not.

The Second Amendment's plain text does not cover the "keep[ing] and carry[ing] [of] *any weapon whatsoever* in any manner whatsoever and for whatever purpose."  *Id.* at 626 (emphasis added).  Rather, the "Arms" to which the amendment refers are only those that are "in common use."  *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at, 627.  The Supreme Court has explained that a weapon is not "in common use"—and thus the Second Amendment's plain text does not cover it—if the weapon is "dangerous and unusual."  *Heller*, 554 U.S. at 627; *see also id.* at 625 (citing *United States v. Miller*, 307 U.S. 173 (1939)) ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.").

The parties do not dispute that machineguns are "dangerous."  The only issue is whether machineguns are "unusual."

The Defendant points out that there are 740,000 civilian-owned machineguns in this country (a 150% increase from the number of civilian-owned machineguns in 2015 and 2016) and argues that this number is sufficient to show machineguns are not "unusual" and are thus "in common use."  *See* Def.'s Reply 18.  To support this argument, the Defendant relies on three non-binding sources of authority: a Supreme Court concurrence signed by just two justices, and two district court cases from districts in a different circuit.  *See id.* 19.

First, the Defendant cites Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016).  In that concurrence, which only Justice Thomas joined, Justice Alito appeared to opine that 200,000 stun guns was a high enough number to qualify stun guns as "widely owned."  *See id.* at 420 (Alito, J., concurring).

But as defense counsel has repeatedly reminded this Court in the context of the separate opinions authored in *Bruen*, concurring opinions are not holdings of the Supreme Court that bind this Court.  *See, e.g.*, Def.'s Reply 5 (citing *Marks v. United States* 430 U.S. 188, 193 (1977)).  The only opinion in *Caetano* that binds this Court is the majority, per curiam opinion.  The Court in *Caetano* indeed vacated the judgement of the Massachusetts Supreme Court which held that stun guns are "unusual."  577 U.S. at 412 (per curiam).  But the majority did not vacate the decision below because of any numerical disagreement.  Rather, it did so because the Massachusetts Supreme Court applied a standard "inconsistent with *Heller*" when it erroneously "equat[ed] 'unusual' with 'in common use at the time of the Second Amendment's enactment.'"  *Id.*  The *Caetano* majority itself never delved into whether stun guns are "dangerous and unusual."  *See id.* at 411–12.

The bottom line is that nothing from *Caetano* controls on the question of whether machineguns are "unusual."  The *Caetano* majority opinion did not even answer the question of whether stun guns are numerous enough to not be "unusual."  *See id.* at 411–12 (per curiam). Justice Alito gave his answer in his separate opinion, but that answer and any guidance that could be drawn from it, even setting aside the differences in the weapon concerned, is not binding.  *See Myers*, 418 F.3d at 406 ("[Lower courts] are not bound by dicta or separate opinions of the Supreme Court.").

After *Caetano*, all the Defendant is left with is two opinions from New York-based district courts.  The first is *Maloney v. Singas*, which found evidence that the 64,890 nunchaku sold on the

retail market in the United States between 1995 and 2018 were sufficient to show that the weapon was "in common use." *See* 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018). The second is *Avitabile v. Beach*, which found evidence that the at least 300,000 tasers owned by private citizens in the United States were sufficient to show that the weapon was "in common use." *See* 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019). Neither of these opinions binds this Court. And, again, neither case deals with machineguns.

This Court does not find any of Defendant's non-binding authority persuasive. Instead, the Court finds that the question of whether machineguns are "unusual" can be answered by simply comparing the number of the machineguns in this country to the total number of guns overall. As determined by a likeminded district court in the Western District of Texas, "[a]lthough the number of civilian-owned machineguns has increased to about 740,000, this amount—which is less than .2% of total firearms in the United States—remains too insignificant for machineguns to be considered in common use." *United States v. Simien*, --- F.Supp.3d ----, 2023 WL 1980487, at *9 (W.D. Tex. Feb. 10, 2023). Applying this metric, machineguns are thus both "dangerous and unusual" weapons, and their possession is not covered by the Second Amendment's plain text. *See Heller*, 554 U.S. at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) ("'[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes,' including 'short-barreled shotguns' and 'machineguns.'" (quoting *Heller*, 554 U.S. at 624–25)), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.[21]

By holding that § 922(o) does not run afoul of the Second Amendment, this Court aligns itself with the consensus. "[S]ince *Heller* was decided, every circuit court to address the issue has

---

[21] In *Kolbe*, the Fourth Circuit held, *en banc*, that assault weapons and large-capacity magazines like M-16s are "most useful in military service" and accordingly "are not protected by the Second Amendment." *Kolbe*, 849 F.3d at 144. *Bruen* abrogated the *en banc* Fourth Circuit's alternative holding that relied on intermediate scrutiny; *Bruen* did not abrogate *Kolbe*'s ruling about what weapons fall outside of the Second Amendment's ambit. *See Bruen*, 142 S. Ct. at 2126.

held that there is no Second Amendment right to possess a machine gun." *United States v. Hoover*, 635 F. Supp. 3d 1305, 1325 (M.D. Fla. 2022) (quoting *United States v. Henry*, 688 F. 3d 637, 639–40 (9th Cir. 2012)); *see, e.g.*, *United States v. One (1) Palmetto State Armory PA15 Machinegun Receiver/Frame*, 822 F.3d 136, 143 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *United States v. Allen*, 630 F.3d 762, 766 (8th Cir. 2011); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes."), *cert. denied*, 555 U.S. 1174 (2009); *see also Hollis v. Lynch*, 827 F.3d 436, 448–41 (5th Cir. 2016) ("Machine guns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection . . . ."). And since *Bruen* was decided, district courts have continued to reach the same result. *See, e.g.*, *Simien*, --- F. Supp. 3d. ----, 2023 WL 1980487, at *9 ("[M]achineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection."); *United States v. Kittson*, 2023 WL 5015812, at *3 (D. Or. Aug. 7, 2023) ("[M]achineguns are dangerous and unusual weapons not protected by the plain text of the Second Amendment."); *Cox v. United States*, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) ("Machine guns are not protected 'arms' under the Second Amendment because they are both 'dangerous and unusual' . . . ."); *United States v. Dixon*, 2023 WL 2664076, at *3 (N.D. Ill. Mar. 28, 2023); *United States v. Kazmende*, 2023 WL 3872209, at *2 (N.D. Ga. May 17, 2023) ("[M]achineguns are dangerous and unusual weapons that are outside the protection of the Second Amendment . . . ."), *report and recommendation adopted*, 2023 WL 3867792 (N.D. Ga. June 7, 2023).

Defendant's reading of the Second Amendment's plain text to cover machineguns, *see* Def.'s Reply 20 (arguing that "the Second Amendment's plain language covers possession of such guns"), is a reading that the *Heller* Court would have found "startling." *See Henry*, 688 F.3d at

640 ("[T]he *Heller* Court stated that it would be 'startling' for the Second Amendment to protect machine guns."). As Defendant is armed only with a paucity of non-binding authority relating to other types of weapons to support this position, this Court will not take the "startling" step that the Defendant seeks in his Motion.

Machineguns are "dangerous and unusual" weapons and thus are not weapons "in common use." For that reason, the Second Amendment's plain text does not cover their possession.[22] Thus, the Court holds that § 922(o) is constitutional, both facially and as-applied to Defendant.[23]

The Motion to Dismiss will accordingly be denied as to Count Two.

## V. CONCLUSION

For the reasons detailed above, Defendant's Motion to Dismiss the Indictment, ECF No. 21, will be denied in full.

An appropriate Order shall issue.

_____ /s/ _____

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: <u>August 31, 2023</u>

---

[22] The Defendant argues that the "dangerous and unusual" inquiry is purely a *Bruen* step two matter. But the Court does not see it that way. Whether a weapon is "dangerous and unusual" determines whether it is "in common use." And the *Heller* Court explained that the "in common use" label limits "the sorts of weapons protected" by the Second Amendment's "right to keep and carry arms." *Heller*, 554 U.S. at 627. Because determining which "arms" the amendment covers is a textual matter, in this Court's view (and others' too), the "dangerous and unusual" issue is part of the textual analysis at *Bruen*'s step one. *See, e.g.*, *Kittson*, 2023 WL 5015812, at *3 ("[M]achineguns are dangerous and unusual weapons not protected by the plain text of the Second Amendment."); *Cox*, 2023 WL 4203261, at *7 ("Machine guns are not protected 'arms' under the Second Amendment because they are both 'dangerous and unusual' . . . .").

[23] Because this Court disposes of the Defendant's § 922(o) challenge at *Bruen* step one, the Court does not need to consider whether the government met its burden at *Bruen* step two to show a sufficiently similar historical analogue to § 922(o).